No. 26-842

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

BERKELEY HOMELESS UNION, ET AL.

*Plaintiffs-Appellees.*

v.

CITY OF BERKELEY, ET AL.,

*Defendants-Appellants*,

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-CV-01414-EMC
Hon. Edward M. Chen

---

### APPELLANTS' OPENING BRIEF

---

Farimah Faiz Brown, City Attorney, No. 201227
Laura Iris Mattes, Deputy City Attorney, No. 310594
Stephen A. Hylas, Deputy City Attorney, No. 319833

Berkeley City Attorney's Office
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
(510) 981-6998
lmattes@berkeleyca.gov

*Attorneys for Appellants*
*City of Berkeley, Thomas Gregory, Paul Buddenhagen,*
*Peter Radu, Okeya Vance-Dozier, Rashi Kesarwani*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES.................................................................. ii

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ........................................................4

STATUTORY AND REGULATORY AUTHORITIES ...........................5

ISSUES PRESENTED .........................................................................5

STATEMENT OF THE CASE ..............................................................6

SUMMARY OF THE ARGUMENT....................................................41

STANDARD OF REVIEW ................................................................46

ARGUMENT....................................................................................47

    I.   This Court Has Jurisdiction Over This Appeal. ....................................47

    II.  BHU Lacks Standing to Pursue Its ADA Claims ...............................51

    III.    The District Court Erred in Finding BHU Demonstrated a Likelihood of Success on Its ADA Claim ......................................................61

    IV.    The District Court's Serial Extensions of the Injunction Violate Binding Ninth Circuit Precedent.................................................................74

    V.  The District Court's Modification of the Injunction Was Unlawful ...79

CONCLUSION .................................................................................80

STATEMENT OF RELATED CASES ................................................81

## TABLE OF AUTHORITIES

**Cases**

*Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.,*
   458 F. Supp. 2d 160 (S.D.N.Y. 2006) ........................................................ 42, 56

*Ahmed v. Regents of Univ. of California,*
   No. 17-cv-0709-MMA (NLS), 2018 WL 3969699
   (S.D. Cal. Aug. 20, 2018)............................................................................. 64, 65

*Assoc. Gen. Contractors of Am., S.D. Chapter, Inc. v. Cal. Dep't of Transp.,*
   713 F.3d 1187 (9th Cir. 2013)............................................................... 42, 43, 58

*Chew v. Legislature of Idaho,* 512 F. Supp. 3d 1124 (D. Idaho 2021) .................73

*City of Grants Pass, Oregon v. Johnson,* 603 U.S. 520 (2024)..............................78

*Coalition on Homelessness v. City and County of San Francisco,*
   758 F. Supp. 3d 1102 (N.D. Cal. 2024) ...................................................... 54, 55

*Communities Against Toxics v. Armorcast Prods. Co., Inc.,*
   No. CV 14-5728 PA (FFMX), 2014 WL 12966008
   (C.D. Cal. Nov. 12, 2014)..................................................................................57

*Duvall v. County of Kitsap,* 260 F.3d 1124 (9th Cir. 2001)..................................73

*Federal Trade Comm'n v. Enforma Nat. Prods., Inc.,*
   362 F.3d 1204 (9th Cir. 2004)..........................................................................46

*Food & Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367 (2024).............53

*Garcia v. Google, Inc.,* 786 F.3d 733 (9th Cir. 2015)............................................62

*Giebeler v. M & B Assoc.,* 343 F.3d 1143 (9th Cir. 2003)....................................71

*Gilman v. Schwarzenegger*, 638 F.3d 1101 (9th Cir. 2011) ........................ 46, 47

*Gon v. First State Ins. Co.*, 871 F.2d 863 (9th Cir. 1989) ....................................48

*Isaacson v. Mayes*, 84 F.4th 1089 (9th Cir. 2023) ...................................................52

*Karkanen v. California*, No. 17-CV-06967-YGR,
　　2018 WL 3820916 (N.D. Cal. Aug. 10, 2018)....................................................70

*LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947 (9th Cir. 2021) 52, 57

*Lovell v. Chandler*, 303 F.3d 1039 (9th Cir. 2002) ........................................ 68, 70

*Mayfield v. City of Mesa*, 131 F.4th 1100 (9th Cir. 2025) ...................................66

*McElwee v. Cnty. of Orange*, 700 F.3d 635 (2d Cir. 2012)....................................65

*Memmer v. Marin Cnty. Cts.*, 169 F.3d 630 (9th Cir. 1999).................. 62, 68, 70

*Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803 (8th Cir. 2015).............65

*Movie Sys., Inc. v. MAD Minneapolis Audio Distributors, a Div. of Smoliak &*
　　*Sons, Inc.*, 717 F.2d 427 (8th Cir. 1983) ............................................................48

*Nat'l Fed. of the Blind of Cal. v. Uber Techs., Inc.*,
　　103 F. Supp. 3d 1073 (N.D. Cal. 2015)...............................................................60

*NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025) ................................1, 60

*Northland Parent Ass'n v. Excelsior Springs Sch. Dist. # 40*,
　　571 F. Supp. 3d 1104 (W.D. Mo. 2021) ....................................................... 55, 58

*Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003)...............................59

*Pierce v. Cnty. of Orange*, 526 F.3d 1190 (9th Cir. 2008).............................. 66, 67

*Public Service Co. of Colo. v. Batt*, 67 F.3d 234 (9th Cir. 1995) ...........................50

iii

*Rsch. Am., Inc. v. Simpson*, No. 23-CV-320-LJV-HKS,
2024 WL 4633423 (W.D.N.Y. Oct. 31, 2024)....................................................76

*Satanic Temple v. Labrador*, 149 F.4th 1047 (9th Cir. 2025) ................................52

*Serris v. Chastaine*, No. 2:22-cv-0434-JAM-CKD PS,
2022 WL 2133900 (E.D. Cal. June 22, 2022) ....................................................70

*Sharp v. Weston*, 233 F.3d 1166 (9th Cir. 2000). .......................................... 46, 79

*Smith v. Marsh*, 194 F.3d 1045 (9th Cir. 1999) ....................................................68

*Snapp v. United Transp. Union*, 889 F.3d 1088 (9th Cir. 2018) ......... 2, 44, 64, 73

*Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750 (9th Cir. 1982) .........61

*Steger v. Franco, Inc.*, 228 F.3d 889 (8th Cir. 2000) ..................................... 42, 56

*Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276 (7th Cir. 2015) ......................65

*Tausher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959 (9th Cir. 2019)...............64

*Tennessee v. Lane*, 541 U.S. 509 (2004)...............................................................71

*Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003) ............................................71

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)...............................................54

*Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cty.*,
550 F.3d 770 (9th Cir. 2008)..............................................................................47

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996) ...................................................................................... 43, 59

*Updike v. Multnomah Cnty.*, 870 F.3d 939 (9th Cir. 2017)..................................68

iv

*Vivid Ent., LLC v. Fielding*, 774 F.3d 566 (9th Cir. 2014) ...................................46

*Waskul v. Washtenaw Cnty. Community Mental Health*,
   900 F.3d 250 (6th Cir. 2018).................................................................................54

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137 (2d Cir. 2005)........76

*Where Do We Go Berkeley v. Cal. Dep't of Transp. ("Caltrans")*,
   32 F.4th 852 (9th Cir. 2022) ..................................... 2, 3, 6, 34, 44, 71, 74, 75, 78

*Winter v. Natural Resources Defense Council Inc.*, 555 U.S. 7 (2008) .......... 61, 76

*Wong v. Regents of Univ. of Cal.*, 192 F.3d 807 (9th Cir. 1999) ................... 43, 59

*Zimmerman v. Oregon Dept. of Justice*, 170 F.3d 1169 (9th Cir. 1999)..............63

## Statutes

28 U.S.C. § 1292(a) ............................................................... 5, 47, 49, 51
42 U.S.C. §§ 12111, 12132 ...................................................................64

## Constitutional Provisions

Article III.................................................................................. 56, 59, 80

## INTRODUCTION

Plaintiff Berkeley Homeless Union ("BHU") is an organization that purportedly represents unhoused persons. It sued the City of Berkeley in February 2025 to stop the City from abating a dangerous encampment with an extensive history of fire, environmental health, and safety concerns. BHU's principal claim is that the Americans with Disabilities Act ("ADA") gives its members the right to a "reasonable accommodation" to remain in the encampment indefinitely unless permanent, non-congregate housing is available.

This ADA claim is not viable. As a threshold matter, BHU lacks standing to bring ADA claims seeking individualized accommodations on behalf of unnamed members who are not parties, without regard to the vast spectrum of mental and physical conditions and requested accommodations they may have. *See NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025) (affirming dismissal where claim inherently required the participation of an organization's individual members). BHU's claim is also foreclosed by binding precedent. This Court has held that

1

occupying public land indefinitely is not a reasonable modification of an encampment-abatement program under the ADA because it fundamentally alters the purpose of the abatement. *See Where Do We Go Berkeley v. Cal. Dep't of Transp. ("Caltrans")*, 32 F.4th 852, 862 (9th Cir. 2022).

Despite these fatal flaws in BHU's case, the district court issued a preliminary injunction blocking the City from clearing the encampment for 60 days and mandating it to engage in an interactive process with certain campers during that period. Inexplicably, the district court did not premise this injunction on a finding that the City denied any camper a reasonable accommodation. Rather, its likelihood-of-success analysis found only that injunctive relief was warranted because the City had not "completed" the interactive process. 1-ER-127-129.

This is legal error and requires reversal. There is no freestanding ADA interactive process claim or mandate that the interactive process be "complete" before a city can move forward with its programs. *See Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018). Nor could there be. Such a mandate would erase BHU's burden to show availability of a

reasonable accommodation and deprive Title II entities like the City of their right to assert statutory defenses. It would also pressure entities to make premature or uninformed accommodation decisions to avoid litigation, undermining the balance Congress struck between the rights of people with disabilities and public entities' need to efficiently manage public programs.

Even putting aside the errors with the court's initial injunction, the district court further erred by serially extending the injunction from 60 days to over eight months—and later modifying it to extend until full resolution of BHU's claims on the merits—without any analysis or new facts or law warranting extension or modification. In addition to plainly exceeding the court's authority under *Caltrans, see* 32 F.4th at 862, the court's extensions have effectively required the City to indefinitely house individuals on its streets despite dangerous and unsanitary conditions, even though nothing in the ADA requires that the City do so. The court's modification of the injunction to extend to full resolution on the merits is also not even supported by its own order, given that the court has never

even found that BHU is likely to succeed on the merits of its ADA claims.

In the meantime, harms have compounded. Pedestrians and visitors have been assaulted, businesses have experienced extensive property destruction, rodents have proliferated and communicable diseases have spread. Most recently, the City detected leptospirosis in the encampment's rodent population, which can spread to humans and other animals and lead to significant health consequences, including death. It is precisely these concerns that led the City to determine that an abatement and closure was necessary. This determination is squarely vested within the City's authority. By prohibiting the City from acting, the district court has committed legal error and abused its discretion by unlawfully substituting its own judgment for the City's.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court has jurisdiction under 28 U.S.C. § 1331. On June 10, 2025, the district court issued a preliminary injunction against the City that was to last for 60 days. 1-ER-127-129. The district court later continued that

4

injunction several times. 1-ER-48, 1-ER-45-47, 1-ER-22. In August 2025, the court forced the parties into a settlement process and continued the injunction until the settlement process was over. 1-ER-48, 1-ER-65. In September 2025, upon the completion of the settlement process, the court again continued the injunction until October 31, 2025. 1-ER-45-47, 1-ER-43:5-13. On October 22, 2025, the district court again continued the injunction until January 6, 2026. 1-ER-22. On January 13, 2026, the court modified the scope of the injunction and further continued it until March 20, 2026. 1-ER-19-21. The City timely filed its notice of appeal of the January 13, 2026 order on February 11, 2026. 9-ER-1453-1457. This Court has jurisdiction over that appeal under 28 U.S.C. § 1292(a)(1).

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

1) Did the district court err in finding that BHU demonstrated standing to bring ADA claims on behalf of its membership?

5

2) Did the district court abuse its discretion in finding BHU had demonstrated a likelihood of prevailing on the merits of its ADA claim?

3) Did the district court violate Ninth Circuit precedent as established in *Caltrans*, 32 F.4th at 852, or otherwise abuse its discretion by extending its injunction past eight months?

4) Did the district court abuse its discretion by modifying the injunction without considering whether a change in facts or law warranted modification?

## STATEMENT OF THE CASE

Like many cities, Berkeley works hard to address the complex issue of homelessness. It has done so by prioritizing providing decent, safe places to live that help individuals stabilize, improve health, reduce harmful behaviors, and increase income. 8-ER-1361. To support its mission, the City has dedicated significant staff and monetary resources. The City maintains a Homeless Response Team ("HRT"), a multi-departmental team

6

that aims to meet the needs of campers while mitigating the negative impacts of encampments on neighbors. 8-ER-1293, 8-ER-1295-1296. Homelessness has dramatically declined in the last several years, thanks in part to a tax that helps fund transitional housing motels and create permanent supportive housing sites. 8-ER-1263-1379. The City continues to offer shelter when feasible and available, despite clarity from the Supreme Court that doing so is not legally required. Notwithstanding these efforts, unsafe homeless encampments persist. *Id.*

**The Harrison Corridor Encampment and Notice of Abatement and Closure**

One such encampment is located on Harrison Street and 8th Street in West Berkeley (the "Harrison Corridor"). 8-ER-1263. The Harrison Corridor is one of the largest and longest-established encampments in Berkeley and has received more services than any other encampment in the City. *Id.* Indeed, over one in five shelter offers has been to people living in the Harrison Corridor. *Id.* As of December 2024, the City had performed 18 encampment operations in the area, such as deep cleanings and area

closures, with each closure accompanied by shelter offers for campers. *Id*. In 2024, the City spent $5 million to lease a motel to operate it as a low barrier, 24/7, non-congregate shelter and dedicate it entirely to people living in the Harrison Corridor. *Id*. Unfortunately, some Harrison Corridor campers have declined the City's offers even when these non-congregate options are offered. 8-ER-1293.

The City has provided a wide range of hazard-reducing services to campers, including the provision of: 1) a dumpster with regular servicing; 2) port-a-potties with wash stations; 3) mobile shower and laundry service; 4) rodent treatments; and 5) new tents and sterility tubs to maintain cleaner conditions. 8-ER-1265. The City also hosts weekly conferences focused on providing support services, including housing and medical care, for campers in the Harrison Corridor, among others. 8-ER-1266.

Despite this significant investment, dangerous and unsanitary conditions have continued in the Harrison Corridor.[1] On December 6, 2024,

---

[1] Due to these conditions, a group of residents and local businesses have sued the City in state court, alleging that the encampment poses a private and public nuisance. 7-ER-1174-1222. The City sought to dismiss the

8

the City conducted a site visit that revealed significant health and safety

hazards, including RVs discharging sewage onto the pavement, scattered

and blood-filled syringes; extensive and active rodent burrows;

unmitigated human and animal waste; and rotting food. 8-ER-1372-1379.

The sidewalks and traffic lanes were also obstructed by personal

belongings and debris. *Id*.



---

lawsuit due to the district court's injunction, but the City's motion was
denied. *Id*. The City therefore must litigate the state case, whose plaintiffs
demand a closure of the encampment, while litigating this federal lawsuit,
whose plaintiffs demand the ability to remain in the encampment.



Feces is said to be a major food source for rats in urban environments. While containing toxins and infectious bacteria capable of causing illness, poop also contains fats, proteins, carbohydrates, and minerals that can be ingested safely by certain animals, including rats.



Blood contaminated syringes can contain synthetic opioids, other illegal drugs, and biological hazards.

*Note: During this assessment, two individuals were observed distributing food snacks and syringes.*



Uncontained garbage and rotting foods will provide sustenance for vermin and over time, such conditions will lead to large populations of rodents.



Rodents use burrows to move from place to place. Burrows are typically found around concrete slabs and building foundations, under materials stored outdoors, and along fence rows.




Clutter is another attractant for rodents, providing sites for shelter and nesting.

The site visit report found numerous violations of the Berkeley Municipal Code, including street and sidewalk obstructions, rodent harborage, and storage of combustible material outside. 8-ER-1372-1379.

City staff transmitted these findings to the City Manager in a memorandum that also documented the exceedingly high rate of calls for Berkeley Police and Fire services. 8-ER-1268-1274. Police calls in the one-year period from August 2023-July 2024 totaled 252—an average of one call

11

every day and a half. 8-ER-1362. Fire service calls totaled 78 during that same time frame, with safety impacts for nearby residents, workers, and detrimental impacts on business operations. 8-ER-1268-1274. Based on these findings, City staff identified the encampment as one of critical priority, 8-ER-1264, and the City Manager ordered the Harrison Corridor closed on December 18, 2024. 8-ER-1260 at ¶ 6.

On January 7, 2025, the City posted a notice throughout the Harrison Corridor informing campers of the City's findings and ordering them to abate the nuisances by February 10, 2025. *Id.;* 8-ER-1384. This notice gave campers more than one month to comply, going far beyond the standard 72-hour notice period. *Id.*; *see Sullivan v. City of Berkeley*, No. C 17-06051 WHA, 2017 WL 4922614, at *6 (N.D. Cal. Oct. 31, 2017) (no likelihood of success on property seizure claims when plaintiffs were given 72 hours' notice).

The notice included a fact sheet informing individuals that they had until February 10, 2025 to leave the encampment with their belongings and vehicles, after which time the area would be declared a No Lodging and

No Property area. Anyone remaining after that date would be subject to

citation or arrest and any personal property would be subject to removal.

*Id.*; 8-ER-1389. The notice informed campers of the City's property storage

service, how to seek ADA accommodations, and how to appeal the hazard

declaration. *Id.*; 8-ER-1384, 1387, 1389-1390. The notice also explained how

to access available temporary shelter beds. 8-ER-1390-1391.  It underscored

the City's goal of connecting those living in the encampment to permanent

housing, where possible, but explained that the City does not control access

or referrals to those services. *Id.*

On January 22, 2025, the City held a hearing on campers' appeal of

the nuisance declaration and order to abate. 8-ER-1381-1382 at ¶ 5. Based

on the record evidence, the Administrative Hearing Officer issued a ruling

overruling the appellants' objections and affirming the nuisance findings.

8-ER-1382 at ¶ 6, 1402-1405.

On January 31, 2025, HRT members posted copies of a second public

notice throughout the Harrison Corridor. 8-ER-1382 at ¶ 7. This notice

included a copy of the hearing officer's decision, in addition to the fact

13

sheet and housing request information, and reiterated the February 10, 2025 compliance deadline. 8-ER-1402-1405.

## ADA Requests and Interactive Process Discussions

Shortly before the deadline, the City began receiving ADA accommodation requests by email from Yessica Prado, who identified herself as a BHU[2] representative writing on behalf of Harrison Corridor campers. 4-ER-488-570. However, the individual campers were not included in the correspondence; Ms. Prado served as the sole source of communication. *Id.* The emails provided only a brief, high-level description of the person's disabilities and then listed requested accommodations. *Id.* The vast majority of accommodation requests involved: 1) placement in an "ADA-compliant" non-congregate shelter; and 2) the ability to remain in

---

[2] BHU has refused to provide information regarding its purpose and membership. 4-ER-432-449, 459-474. It is apparent from BHU's conduct in this litigation that one of its primary objectives is to allow individuals to remain unsheltered even in unsanitary and hazards conditions.

place or relocate to a sanctioned encampment without arrest or citation[3] until housing could be located. *Id.* The communications also commonly contained other requests, such as executive functioning support, low stimulation meetings, and relocation and packing assistance. *Id*.

Despite receiving notice on January 5, BHU waited until they had exhausted other avenues to stop the abatement before sending accommodation requests. The first ADA requests were not received until shortly before the February 10 compliance deadline. 4-ER-490, 488-570, 6-ER-950-962. For some individuals, BHU did not submit accommodation requests until April 2025, two months after the initial compliance deadline and three months after receiving the notices. 6-ER-950-962, 4-ER-488-570. BHU provided no explanation for these delays. The City nonetheless responded to each of the approximately dozen accommodation request it received from Ms. Prado. 6-ER-950-962, 4-ER-488-570.

### Lawsuit and Initial Proceedings

---

[3] There are no "sanctioned encampments" or other locations in the City where an individual can camp that are not subject to limitations or closure pursuant to the City's encampment management policies.

On February 11, 2025, pro se plaintiffs Adrien Bouchard, Nicholas Johnson, Frank Moore, and BHU filed a complaint asserting federal and state constitutional claims for exposure to state created danger and property destruction; and disability discrimination claims under the ADA and California Government Code Section 11135. 9-ER-1417-1451. Plaintiffs concurrently filed a motion for a temporary restraining order ("TRO"). 9-ER-1407-1410, 9-ER-1411-1416.

On February 14, 2025, the Honorable Haywood S. Gilliam, Jr. granted plaintiffs' TRO motion "solely to maintain the status quo until the earliest possible hearing on the merits of the temporary restraining order request." 7-ER-1255. The TRO enjoined the City from proceeding with the planned cleaning and eviction of the Harrison Corridor. *Id*. However, because BHU was unrepresented, the relief did not apply to BHU as an entity under the court's local rules. *See* N.D. Cal. Civil Local Rule 3-9(b). 7-ER-1253 at n.1.

Several attorneys subsequently made appearances on behalf of BHU and two of the individual plaintiffs. The parties agreed to set a TRO hearing for April 29, 2025. 7-ER-1250. However, just four days before that

16

hearing, the Honorable Edward M. Chen vacated the April 29, 2025 TRO

hearing ordered all parties to file preliminary injunction ("PI") briefs by

May 2, 2025 instead. 7-ER-1249, 7-ER-1248.

## First Motion for Preliminary Injunction

While Plaintiffs Bouchard and Johnson filed a joint preliminary

injunction motion, neither Moore nor BHU filed a timely motion.[4] 7-ER-

1223. In opposition, the City submitted evidence of the continued alarming

encampment conditions. 7-ER-1122-1147; 7-ER-1148-1152. A recent

inspection revealed rodent harborage, rotting food, feces, accumulations of

garbage and debris, and scattered used syringes. 7-ER-1153-1157. Debris in

some places overwhelmed the sidewalk, extending into the lane of traffic

and impeding safe vehicle passage. 7-ER-1149 at ¶ 3. The City also cited

---

[4] Moore has never filed a single motion in this litigation nor has an attorney
made a notice of appearance on his behalf. In June 2025, the City moved to
dismiss Moore, 6-ER-891-916, but no opposition was filed on his behalf. In
its reply, the City argued Moore's claims should be dismissed due to his
failure to oppose and prosecute his claims. 6-ER-882-890.

recent violent crime that left City staff fearing for their safety, including a

camper's assault of a passerby that resulted in severe head wounds 7-ER-

1149 at ¶ 4.

### May 23, 2025: First Preliminary Injunction Hearing

On May 23, 2025, the district court held a hearing on Bouchard and

Johnson's PI motion. The parties informed the district court that they had

reached tentative settlement agreement and that the individual plaintiffs

wished to withdraw their motion, clearing the way for the City to abate the

encampment. 6-ER-983. BHU then orally requested to file a belated motion,

despite providing no reason for its delay. 6-ER-984-987. The district court

granted the request over the City's objection and set a new briefing

schedule. 6-ER-988-989.

### May 2025: Second Motion for a Preliminary Injunction

On May 23, 2025, BHU filed its belated PI motion seeking to enjoin

the City from abating the encampment, 6-ER-963, which the City opposed.

6-ER-921. BHU included only two declarations in support of its motion: (1)

a declaration that contained no testimony regarding BHU's

accommodation requests; and (2) a declaration from Ms. Prado, who testified to submitting over 21 requests on behalf of unnamed BHU members for "individualized accommodations, including access to sanitation, portable water, mobility assistance, ADA-compliant shelter, executive functioning support, and transitional support before evictions." 6-ER-971-974, 6-ER-975-978. The declaration included no evidence that Prado had authority to make requests on behalf of these unnamed BHU members or that the unnamed members had qualifying disabilities, required specific accommodations for those disabilities, or were denied access to City programs because of their disabilities. 6-ER-963-970.

The City's opposition argued that BHU failed to establish standing, had not demonstrated a likelihood of success on any claims, and that the balance of equities favored the City due to unsanitary and dangerous encampment conditions. 6-ER-921-949. With regard to the ADA claims, the City argued that BHU had not submitted evidence that the City had failed to engage in the interactive process or denied any BHU members a reasonable accommodation. *Id*. In addition, the City submitted contrary

evidence showing that it had fully complied with the ADA. The record

included examples of accommodation requests the City had received from

three campers in April 2025. 6-ER-950-962. All three individuals alleged to

have various mental and physical conditions that affected their ability to

comply with the City's abatement order and each requested multiple

accommodations. *Id.* Most prominently, they requested the ability to

remain in place without arrest or citation or to be placed in non-congregate

shelters as an accommodation. *Id*. The City had promptly denied these two

requests because they would represent a fundamental alteration of the

abatement action. However, the City had offered other requested

accommodations, such as packing assistance or storage. *Id*. For other

requests, the City asked for documentation reflecting the nexus between

their disabilities and the requested accommodation. *Id.* The City thereafter

received no response for several months. *Id*.

### June 10, 2025: Second Preliminary Injunction Hearing

On June 10, 2025, the district court heard argument on BHU's PI

motion. The court acknowledged that BHU faced some "serious issues"

related to associational standing, noting that "there's a big difference between somebody who has an injured leg or a leg that limits their mobility and as to someone who has PTSD and requires certain conditions versus somebody who may have other mental limitations. It seems like that's kind of a case-by-case situation and an example where that third prong of associational standing is not met." 1-ER-71:23-72:4. The district court further observed that "it is problematic when you try to get broad relief, aggregate relief, when the ADA question is really an individualized kind of question." 1-ER-111:9-11.

As to BHU's ADA and state created danger claims, the district court asked BHU whether under its legal theory it could "imagine a situation where a city could ever remove an encampment," to which it responded, "if they found housing – non-congregate housing for every single individual." 1-ER-80:18-23.[5] In the absence of such housing, BHU suggested that the court should order the City to convert City property into

_____

[5] This comment exemplifies BHU's stance that absent every camper accepting non-congregate shelter, BHU would oppose all City efforts to close encampments.

a sanctioned encampment and move individuals there while they await "durable" housing. 1-ER-84:11-20. In response, the City reiterated that one in five shelter offers the City made were to Harrison Corridor campers, including multiple purported BHU members who declined those offers; that it had raised millions of dollars to fund non-congregate shelters, one of which had been specifically dedicated to Harrison Corridor campers; and that, regrettably, the "durable" option of permanent supportive housing was not controlled by the City.  Although the City has advocated for prioritizing Harrison Corridor campers for permanent housing, it can only refer individuals to Alameda County for placement consistent with federal regulations. 1-ER-86:8-21; 1-ER-87:5-19; 1-ER-88:6-16; *see also* 8-ER-1264. Neither HUD nor Alameda County is a party to this action.

Turning to the accommodation requests, the district court asked about the status of the interactive process. 1-ER-93:22-94:5. Although the parties had been engaged in discussions for over five months, BHU submitted no evidence of the parties' exchanges, nor did it identify any reasonable accommodations the City denied. 1-ER-96:20-97, 6-ER-963-968.

By contrast, the City proffered evidence showing that, consistent with the ADA, it had already denied any requests that would fundamentally alter the program, such as shelter and indefinite stay in the encampment, and granted reasonable requests that could be adequately assessed on the documentation provided. 6-ER-921-949. The court expressed agreement with the City's determinations, stating that "a request to either stay [in the encampment] or for shelter, typically, non-congregate accessible shelter" is a "much tougher claim legally because you have the defense of fundamental alteration of the [...] agency's program and responsibility, that this is something outside the scope." 1-ER-100:2-25.

Notwithstanding the district court's expressed concerns about standing and the merits, it found that BHU had standing for all its claims and that it was "likely to success on its ADA claim that the City has not completed the interactive process to identify a reasonable accommodation for its members living in the Harrison Corridor for whom BHU has submitted accommodation requests." 1-ER-128. The court reached this conclusion without finding that the City denied any reasonable

23

accommodation, finding any facts, citing any caselaw, or undertaking any legal analysis.

The district court denied BHU's separate request to order the parties into settlement discussions overseen by Magistrate Judge Robert Illman, stating that it would not do so unless the parties both agreed and stipulated to that process. 1-ER-125.

**June – August 2025: The City Engages in a Court-Ordered Unproductive and Hostile Interactive Process**

Following the hearing, the court issued an injunction ordering the parties to "complete the interactive process for those BHU members currently residing in the Harrison Corridor" within 60 days and prohibiting the City from abating the encampment until the interactive process was completed. 1-ER-125. The parties were ordered to file a joint status report at the end of the 60-day period. *Id*. Although the City understood the injunction to cover only the seven individuals who Prado contended lived in the Harrison Corridor and for whom she had submitted accommodations requests, the court did not clearly specify, and BHU did

not initially concede the injunction was limited to those seven. *Id.*

The parties began discussing a protocol via email for the court-ordered interactive process, but it quickly broke down. 5-ER-609 at ¶ 3, 611-619. BHU's counsel insisted that all interactive process meetings occur in person even though the parties had previously communicated by email without objection. 5-ER-611-619. As a good faith gesture, the City agreed to in-person meetings despite not being required to under the ADA.

More than two weeks after the Court's order, BHU's counsel proposed scheduling the first in-person meetings in early July 2025 but canceled the day before due to alleged scheduling conflicts. 5–ER-609 at ¶ 6, 628-637. The City thereafter twice attempted to schedule further meetings. 5-ER-647-654. Each attempt was thwarted by BHU's last-minute cancellations, in one instance providing notice three minutes before the meeting was set to begin. 5-ER-650 at ¶ 14.

On July 11, 2025—halfway through the 60 days—purported BHU members finally attended their first in-person ADA meeting. 5-ER-648 at ¶ 7. Although the City had offered to meet with all seven BHU members

25

subject to the injunction, the City initially only met with three people –

Lewanda Parnell, Austin White and Shareef Muwakkil.  All three renewed

requests for accommodations that the City had already denied as

fundamental program alterations, including the ability to remain in the

encampment and non-congregate housing.  In addition, BHU used the

court-ordered interactive process to expand its prior accommodation

requests beyond those at issue when the preliminary injunction was

granted.

     As a result, these meetings were unproductive and contentious. The

first in-person meeting largely involved Mr. White and BHU

representatives resurfacing unrelated allegations and reciting their

criticism of the City's staff and homelessness policies.  5-ER-649 ¶ 8-9, 663-

664 Despite the City's offers of packing assistance and extended time to

relocate, 5-ER-649 at ¶ 11, 5-ER-723-747, BHU refused to respond to any of

the proposed accommodations. 5-ER-717. The meeting ended after White

became exasperated that the City could not provide permanent housing or

permit him to remain in the Harrison Corridor indefinitely. 5-ER-649 at ¶ 9,

5-ER-701. After White departed, BHU informed the City that the remaining scheduled participants for that day had canceled. 5-ER-681. The City subsequently attempted to correspond with White via email about the offered accommodations, but it received no substantive responses. 5-ER-659 at ¶ 11, 5-ER-723-747.

The next meeting with Ms. Parnell demonstrated a similar and concerning pattern. Parnell and BHU's representatives were unprepared to discuss the accommodations that Parnell needed to comply with the City's abatement notice. 5-ER-651-652 at ¶ 20, 22, 5-ER-775-776. Instead, Ms. Parnell began directing threatening statements at City staff, including by saying: "*Say we, why don't I take you out there with me and put you in the water, and you commit suicide with me*?" 5-ER-650 at ¶ 15, 5-ER-652 at ¶ 21-22, 5-ER-796 at 1413-1414. Following her threats to City staff, Parnell left the meeting.

In the next meeting with Mr. Muwakkil, City staff requested that everyone agree to refrain from yelling at or threatening City staff. 5-ER-653-654, 5-ER-811:86-94. Muwakkil and the others present refused to do so

27

and instead characterized the request as "extremely defamatory" and "insulting." 5-ER-653, 5-ER-811:123-812:167. Despite BHU's lack of agreement to civil engagement, the City proceeded with the meeting given the Court's order requiring discussions to continue. 5-ER-653-654, 5-ER-808-855. After a lengthy meeting, Muwakkil stated he only need more time to move and would confirm after the meeting how much time he needed. 5-ER-654,5-ER-837, 5-ER-808-855. However, the City received no response for several months despite timely following up to formalize the requested extension. 5-ER-654, 5-ER-798-807.

On July 21, 2025, the City sent BHU counsel an email reiterating that multiple purported BHU members had not responded to the City's repeated request for meeting availability. 5-ER-644-646. The message also explained that, due to the threats made against City staff and BHU's refusal to agree to refrain from future threats, the City would no longer attend in-person meetings. 5-ER-610, 5-ER-644-646. The City remained willing to proceed via email as the parties had done previously. 5-ER-644-646.

All told, in the allotted 60 days, BHU only offered three people to

meet with the City (despite claiming to represent all seven campers covered by the injunction as well as other encampment residents). 4-ER-588-606; 5-ER-647-645. The remaining BHU members who had submitted accommodations requests never provided their availability or otherwise responded. 4-ER-588-606; 5-ER-647-855. No BHU members accepted any of the offered accommodations. 4-ER-588-606; 5-ER-647-855.

**August 5, 2025 Hearing: First Extension of the Preliminary Injunction Order**

The 60-day preliminary injunction order was set to end on August 8, 2025.

On August 4, just four days before the deadline to file a joint status report that would have ended the injunction, BHU filed an "Ex Parte Application Requesting Order to Show Cause Why Defendants Should Not Be Held in Contempt For Violating Preliminary Injunction." 6-ER-866-881. The motion failed to cite a single procedural rule to support an emergency filing or any City action contravening the district court's order. *Id*.

The City never had the opportunity to file an opposition. Instead, just

hours after BHU filed the motion, during a previously scheduled case management conference, the district court held what amounted to a de facto motion hearing. Although the court gave no notice and initially stated that it was "not here to necessarily adjudicate this motion that was recently filed regarding OSC regarding contempt," 1-ER-53:7-9, it allowed BHU's attorney to speak at length regarding unsubstantiated allegations of injunction violations, and then interrupted the City when it attempted to address BHU's misrepresentations, 1-ER-59:7-9 (City: "Your Honor, there are a number of misrepresentations by Mr. Prince -- ; The Court: Okay. I don't need to hear any more.").

Ultimately, without formally taking evidence or making any factual findings, the court ruled from the bench that it would "change [its prior] order" and appoint Judge Illman to serve a "mediator" for interactive process to "set forth the ground rules whether they need to be in person, whether they can be by Zoom, who is going to attend, and the question about recordation." 1-ER-59.  After the City objected to this high degree of judicial management of the interactive process, the court modified its order

to indicate that Judge Illman would merely serve as a mediator for court-ordered Alternative Dispute Resolution ("ADR") discussions. 1-ER-60:23-61:10.

The district court also extended the initial 60-day interactive process mandate, stating that it was "going to extend the injunction so that this process can go forward." 1-ER-48; 1-ER-61:13-16. It reset the joint status report deadline to October 7, 2025 and set a corresponding conference for October 14, 2025. 1-ER-65. Thus, just mere days away from the end of a limited 60-day injunction, the district court extended the relief for approximately six more weeks, without notice or a meaningful opportunity for the City to be heard.

**August 21, 2025: Vacated Hearing on the City's Motion to Dismiss**

Shortly after the court issued the original PI in June, the City had filed a motion to dismiss making several dispositive arguments, including that BHU lacks standing and that post-complaint events rendered the claims moot. 6-ER-891-916. After the August 5 status conference, the district court vacated this hearing and stayed the motion "pending

resolution of the ADA interactive process or until further order." 1-ER-48.

The court offered no further reason for taking the motion off calendar,

which remains stayed.

**August – September 2025: Mediation Discussions and Second Extension**

**of the Preliminary Injunction Order**

Pursuant to the court's ADR order, the parties participated in several

settlement conferences with Judge Illman. 9-ER-1480-1481. The last, held on

September 10, 2025, ended without a settlement. 6-ER-865.

Just one day later, BHU made yet another attempt to delay the

encampment closure. 6-ER-860-864. This time, BHU filed a motion arguing

that a previously noticed partial closure of the encampment violated the

injunction. *Id.* In its opposition, the City explained that the planned closure

complied with the injunction and was undertaken to mitigate considerable

harm to a neighboring business. Specifically, the encampment completely

blocked the sidewalks, forcing people into the street, and at times

occupying much of the street as well. 6-ER-858. Campers had also shot

guns at security cameras with bullets going through the neighbor's

windows, harassed passersby, and led many working nearby to feel unsafe. *Id.* Fires also continued to threaten structures and individuals alike. One fire melted a portion of a metal fence and caused toxic materials to leak into the street and onto private property. *Id.*

On September 12, 2025, the court denied BHU's motion to halt the partial closure, as it complied with the injunction. 1-ER-45-47. However, without any factfinding or legal analysis, the district court imposed yet another extension of the interactive process period, ordering the parties to "complete the interactive process no later than October 31, 2025." *Id.* "By that date the parties shall file a joint statement identifying the status of the interactive process and each party's last and best position regarding accommodations for each of the eight individuals." *Id.* The court indicated that it would review this statement and "rule [on] whether the interactive process has been completed." 1-ER-36-39.

**September – October 2025: Continued Interactive Process Discussions**

After the court's latest extension, the City attempted to re-engage with BHU members who had filed requests, but no one responded. 4-ER-

478-487, 4-ER-488-570. In fact, the City had not heard from several individuals since they had filed their initial accommodation requests months before. *Id.*

Nevertheless, just ten days before the new deadline, BHU's counsel filed a declaration requesting yet another injunction extension based, not on any legal requirement, but on counsel's alleged shoulder injury. 4-ER-585-587. He stated that the preliminary injunction should be extended "to a date to be determined after I am sufficiently recovered from whatever surgery is necessary." 4-ER-571-584.

The City opposed. First, it urged that any further extension of the preliminary injunction would violate this Court's ruling in *Caltrans*. 4-ER-478-487. Second, it argued that the ADA requires only reasonable accommodations, and BHU had failed to identify any that were denied. 4-ER-482. Third, it reminded the court that over nine months of discussions via email, telephone, and in-person meetings, no BHU member had accepted any accommodation the City offered.

Lastly, the opposition addressed why no extension was needed:

BHU's counsel's injury would not prevent interactive process discussions from continuing through October 31—namely, that BHU's counsel had not meaningfully engaged in the previous five weeks, attended a single meeting, or represented that he would do so in the future. 4-ER-482-483. In any event, he could participate remotely, as the district court had confirmed was permissible. 9-ER-1484, and 4-ER-484-485.

**October 22, 2025 Order: Third Extension of the Preliminary Injunction Order**

On October 22, 2025, again without undertaking any fact finding or legal analysis, the court granted in part BHU's request and extended the injunction to January 2026. Specifically, it extended the October 31, 2025 deadline by which to file a joint statement, 1-ER-45-47, to January 6, 2026, effectively mandating an additional two months of interactive process discussions and preventing the City from clearing the encampment in the meantime. 1-ER-22. The court also set a status conference for January 13, 2026. *Id.* This City has appealed this unlawful continuation of the preliminary injunction. Brief of Petitioner-Appellant, *Berkeley Homeless*

*Union v. City of Berkeley et al.*, No. 25-7341 (February 25, 2026).

## October 2025- January 2026: Public Health and Safety Conditions Deteriorate to Alarming Levels as the City is Forced to Continue Interactive Process Discussions

In this approximately three-month period, the public health and safety risks posed by the encampment reached unprecedented levels, yet the City remained bound by the injunction and the mandate to continue interactive process discussions.

*a. Public Health and Safety*

In late 2025, for the first time in testing history, the City detected leptospirosis in the encampment's dog and rodent population. 2-ER-198-199, 2-ER-211; 2-ER-213-256, 3-ER-258-261, 2-ER-143-166. Leptospirosis is an infectious disease that spreads from animals, particularly from their urine or saliva, to humans and can cause kidney damage, meningitis, liver failure, and even death. 2-ER-196-197. The encampment's conditions, including considerable rat infestation and abundant standing water, create an elevated risk of leptospirosis spreading to campers and the surrounding

human and animal population. 2-ER-194-203, 2-ER-143-166. Treatment

involves the removal of all vehicles, especially those remaining in place for

a long time, debris or other items that serve as rodent fodder, and the use

of traps, carbon dioxide, and poisonous bait. 2-ER-143-166, 2-ER-136-138, 2-

ER-134-135. As such, leptospirosis cannot be adequately mitigated without

clearing the encampment. 2-ER-136-138.

At the same time, neighboring residents have experienced

unprecedented safety concerns. 2-ER-186-189, 2-ER-183-185. Campers have

struck neighboring fences with large knives, screamed and broken glass on

a neighbor's doorstep, and stolen items from front porches. 2-ER-190-193.

This has led to a high level of anxiety and fear among nearby residents. *Id.*

Campers have moved into the street and refused to step aside when drivers

pass and yell, curse, and threaten vehicles as they pass. 2-ER-186-189, 2-ER-

183-185. In fact, one BHU member protected by the court's injunction

purposefully placed debris across one of the main streets, blocking traffic

on both directions. 2-ER-176-178. The encampment also continues to pose

an unmitigated fire risk. Over the past year, the City has received a fire or

EMS-related call once every two or three days. 2-ER-172.

The passage of time in an encampment that had already been declared a critical public health hazard a year ago has led to potential life-threatening harms.

b. *Interactive Process*

Despite these increased hazards, the City has continued with mandated interactive process discussions. Following the court's latest order, the City made itself available between 8:00 a.m. and 5:00 pm on numerous dates and offered multiple meeting formats expressly approved by the court (Zoom, telephone, and written exchanges). 2-ER-213-256, 3-ER-258-336, 3-ER-337-430. Yet, unsurprisingly, BHU deployed the same delay and obstruction tactics that had proliferated the prior ten months of discussions. For example, BHU conditioned its participation on the City's agreement to allow media attendance in interactive process meetings. *Id.* When the City declined, BHU cancelled scheduled meetings and threatened to terminate all further engagement unless the City acceded. *Id.* BHU also insisted on in-person meetings notwithstanding the court's

ruling that such meetings were not required. *Id.*

The City ultimately consented to BHU's request for in-person meetings in an attempt to move the interactive process forward. *Id.* Even so, three of the eight individuals subject to the court's injunction never participated in interactive process meetings at all, despite repeated outreach by the City. *Id.* Ultimately, the City issued individualized, final determinations on all accommodation requests and submitted its position in a joint status update filed on January 6, 2026. 2-ER-213-256. The update made clear that the interactive process had ended, and as such, so should the preliminary injunction. 2-ER-213-256, 1-ER-127-129 (ordering the parties to "complete the interactive process").

**January 13, 2026: Fourth Extension and Modification of the Preliminary Injunction**

The preliminary injunction issued in June 2025 had one purpose–create a 60-day period during which the parties "shall complete the interactive process." 1-ER-127-129. To effectuate that mandate, it set a deadline to file a joint status update and a corresponding hearing. *Id.* As

discussed in detail above, that deadline was extended numerous times. Yet, finally, on January 6, 2026 the parties filed a joint status update and attended the January 13, 2026 hearing. 2-ER-213-256, 1-ER-2-18. But, shockingly, the court did not consider the joint update nor any of the prior record during the hearing. Instead, it *sua sponte* modified the injunction – stating that the injunction would only be resolved by cross motions for summary judgment and would be extended until those motions are decided. 1-ER-10:15-16, 15:17-18. No party had requested summary judgement briefing and both the close of discovery and deadline to file dispositive motions were months away. 4-ER-450-458, 2-ER-167-170.

When the City objected, arguing that the court had found only likelihood of success on the merits solely with regard to whether the interactive process had been "completed," the court issued a new interpretation that "completion" meant a resolution of the ADA claims on the merits. 1-ER-14:22-15:20 ("[I]t depends on how you construe it. I'm going to construe it to say that when I say completion of the [] interactive process, I mean a complete process to a complete resolution."). In other

40

words, the court collapsed its prior construction of procedural "completeness" to encompass resolution of the underlying litigation claims via summary judgment, or ostensibly if not amendable to resolution at summary judgment, trial. The City argued that this change constituted a modification of the injunction, but the court rejected the City's argument, claiming that it had always intended "fair completion of the interactive process" to mean full resolution on the merits, despite never having stated or implied this previously. 2-ER-131-133.

The court thereafter issued an order setting an expedited schedule for cross motions for summary judgment. 1-ER-19-21. The City appeals from this decision modifying the scope of the injunction.

## SUMMARY OF THE ARGUMENT

This Court should vacate the preliminary injunction because BHU lacks associational standing for its ADA claims and the district court erred in finding that BHU had demonstrated a likelihood of prevailing on its ADA claims. Further, even if the injunction were lawful at its issuance, extending it to well over seven months violates clear precedent from this

Court, and modifying it without a clear change in facts or law is unlawful.

First, the district court's conclusion that BHU has standing was erroneous. Organizations like BHU have standing only if they can show their members would have standing for each claim asserted and form of relief requested. *See Assoc. Gen. Contractors of Am., S.D. Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). To make this showing for its ADA claims, BHU had to identify, for *each* accommodation it seeks, a BHU member with a disability-related need for that accommodation who requested and was denied it by the City. *See Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 174-75 (S.D.N.Y. 2006) (citing *Steger v. Franco, Inc*., 228 F.3d 889, 893 (8th Cir. 2000)). BHU did not meet this burden—its allegations are barebones, and its representative's declaration that she sought many different accommodations for unnamed individuals with unspecified disabilities does not suffice. 6-ER-975-978. The district court also erred by allowing BHU's claims to proceed even though its claims inherently require individual BHU members to participate in the case. Under the associational standing test, district courts must deny

42

standing to associations if they conclude that either the claim asserted or

the relief requested require the participation of the association's individual

members. *Assoc. Gen. Contractors*, 713 F.3d at 1194. ADA reasonable

accommodations claims require individual members to participate in the

litigation because they require substantial individualized evidence, which

the court expressly acknowledged. 1-ER-127-129. The court's decision to

overlook this on the ground that this requirement of the associational

standing test is "prudential" was erroneous. Because this requirement is

prudential, Congress can, by statute, choose to allow associations to sue on

behalf of members even when members' individual participation would

ordinarily be required. *See United Food & Com. Workers Union Loc. 751 v.*

*Brown Grp., Inc.*, 517 U.S. 544, 558 (1996). But Congress did not make this

choice in enacting the ADA. Instead, it required case-by-case

individualized assessment of ADA reasonable accommodations claims,

which necessarily requires individual members to participate. *See Wong v.*

*Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999) (noting "fact-

intensive," nature of such claims).

43

Second, the district court's substantive finding that BHU was likely to succeed on its claim that the City had not "completed" the interactive process was erroneous for two reasons. 1-ER-127-129. First, there is no stand-alone claim for failure to complete or failure to engage in the interactive process, so the court's likelihood-of-success determination rested on a fundamentally erroneous legal standard. *See Snapp*, 889 F.3d at 1095. Second, had the court applied the correct legal standard – i.e., by assessing whether BHU had shown that the City failed to grant a reasonable accommodation – the record would have demonstrated that BHU had not, and could not, make this showing. The court's misunderstanding of the ADA has troubling consequences, including the functional nullification of the statutory defenses Congress crafted, and must be vacated.

Third, the district court's serial extensions of the injunction violate this Court's controlling decision in *Caltrans*. *Caltrans* unequivocally held that the ADA does not empower a district court to issue a six-month long injunction delaying a public-safety encampment abatement in order to

44

facilitate interactive process discussions. 32 F.4th at 865. Yet, that is what the court has done here. Notably, it has done so even against its own recognition that "[a]s an encampment continues over time and if health and safety hazards persist, the government's interest in closure increases." 1-ER-127. At the time the court issued the preliminary injunction, the City had documented years of public health and safety risks posed by the encampment, and these risks have grown to alarming levels since then, even causing an infectious disease outbreak that could cause serious health problems for humans and animals alike 8-ER-1263-1379; 2-ER-196-197; 2-ER-213-256, 3-ER-258-336. The court's refusal to allow the City to close the encampment despite these dangerous conditions constitutes reversible error.

Finally, the district court abused its discretion by modifying the injunction to last until full resolution of BHU's claims without re-analyzing the equities, identifying a change in law or fact, or even finding that BHU was likely to succeed on the merits of its claims. The original injunction was based only on BHU's likelihood of success on its claim that the City

had not "completed" the interactive process. 1-ER-127-129. Extending the

injunction until full resolution of BHU's claims—even after the parties

completed the interactive process—improperly modified the injunction

without a legal basis for doing so.  *See Sharp v. Weston*, 233 F.3d 1166, 1170

(9th Cir. 2000) (modification must be based on change in law or fact).

## STANDARD OF REVIEW

This Court reviews "the legal premises underlying a preliminary

injunction" de novo. *Federal Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.

3d 1204, 1211 (9th Cir. 2004). Otherwise, a district court's grant of a

preliminary injunction is reviewed for abuse of discretion. *Vivid Ent., LLC

v. Fielding*, 774 F.3d 566, 573 (9th Cir. 2014).

"A two-part test is used to determine whether the district court

abused its discretion." *Gilman v. Schwarzenegger*, 638 F.3d 1101, 1105 (9th

Cir. 2011). The first part is whether the district court identified "the correct

legal rule to apply to the relief requested." *Id*. The district court

"necessarily abuses it[s] discretion when it bases its decision on an

erroneous legal standard or on clearly erroneous findings of fact. When the

46

district court is alleged to have relied on an erroneous legal premise, we review the underlying issues of law de novo." *Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cty.*, 550 F.3d 770, 774 (9th Cir. 2008) (quotation marks and citation omitted). Second, there is an abuse of discretion if the district court's application of the standard to its factual findings was a clear error. A finding is a clear error if it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Gilman*, 638 F.3d at 1105-06 (quotation marks and citation omitted).

## ARGUMENT

### I.     This Court Has Jurisdiction Over This Appeal.

This Court has jurisdiction because the City appeals from a January 13, 2026, order that modified the injunction by changing its end date from the completion of the interactive process to full resolution of BHU's claims. 28 U.S.C. § 1292(a)(1) gives this Court jurisdiction over orders "modifying" a preliminary injunction. An order modifies an injunction when it

47

substantially changes the terms of an injunction or the conditions on which

it is premised. *See Gon v. First State Ins. Co.*, 871 F.2d 863, 866 (9th Cir. 1989)

(citing *Movie Sys., Inc. v. MAD Minneapolis Audio Distributors, a Div. of*

*Smoliak & Sons, Inc.*, 717 F.2d 427, 430 (8th Cir. 1983)). The district court

premised its injunction on its finding that BHU was likely to succeed on its

claim that the City "had not completed" the interactive process. 1-ER-127-

129. The injunction thus expressly required the City to complete the

interactive process and to refrain from clearing the encampment "until the

interactive process is fairly completed." *Id.* The court initially ordered the

interactive process completed within 60 days but later extended that period

three times, ultimately moving the deadline to January 6, 2026, with a

hearing set for January 13, 2026. 1-ER-22, 1-ER-43:5-13, 1-ER-45-48, 1-ER-

61:13-16, 1-ER-65. On January 13, however, instead of deciding whether the

parties had completed the interactive process, thus allowing the injunction

to end, the court ruled that the injunction would continue until the court

fully resolved BHU's claims on summary judgment. 1-ER-14:22-15:20; 1-

ER-19-21.  Because this substantially modified a key term of the

injunction—that it would terminate upon completion of the interactive

process—it is appealable under section 1292(a).

The phrase "fair completion" in the court's injunction order does not

affect the order's appealability. The district court stated, in denying one of

the City's procedural motions, that the January 13 order did not modify the

injunction because the court always meant "fair completion of the

interactive process" to require full resolution of BHU's claims on the

merits.  2-ER131-133.  But the plain meaning of "fair completion of the

interactive process" is a reasonable, good-faith completion of the

interactive process. Although the court could have made factual findings

about whether the interactive process was "fairly completed"—e.g., it

could have considered whether the parties held an adequate number of

meetings—it did not do so. Instead, it modified the injunction by tying it to

the merits of BHU's claims rather than the interactive process.

It does not matter that the district court classified this change as

interpreting the injunction rather than modifying it. This Court has made

clear that appellate courts should examine the full record to determine

whether a later order modified a previous one. *See Public Service Co. of Colo. v. Batt*, 67 F.3d 234, 236-237 (9th Cir. 1995) (considering full record rather than isolated language in court's order to determine whether later order modified earlier one). The record here shows that the January 13 order was a modification. Before January 13, 2026, the district court had always been clear that its injunction was tied to the completion of the interactive process. At the hearing where the court first issued the injunction, the court made its likelihood-of-success finding based on a supposed failure to complete the interactive process rather than on the merits. 1-ER-127-129.  It then stated that it would decide, after the parties reported on the completion of the interactive process, "whether to lift the injunction, if I decide that the interactive process has been executed."  (1-ER-121:15-19). The court then insisted for months that the parties engage in a protracted interactive process to satisfy its demands—BHU kept seeking court intervention to extend the interactive process deadline claiming that the City hadn't been adequately engaging; the court granted BHU's requests three times over the City's objections; and the court even insisted that the

parties use the magistrate judge to facilitate interactive process discussions. 1-ER-45-47, 1-ER-48, 1-ER-65, 1-ER-22. At no point did the court or parties suggest that the injunction was tied to something other than the interactive process; the completion of that process was the whole focus of the case for over six months.

In short, the record is clear that the injunction was set to end upon completion of the interactive process, until the court issued its January 13, 2026 order. That order modified the injunction by extending it until the court fully resolved BHU's claims on the merits. Section 1292(a)(1) permits an appeal of such a modification.

## II.     BHU Lacks Standing to Pursue Its ADA Claims

As a threshold matter, this Court should vacate the preliminary injunction because BHU lacks standing to bring the ADA claims on which it is based.[6]

---

[6] While BHU also alleged constitutional claims, the district court held that BHU was unlikely to succeed on them. 1-ER-127-129.  Accordingly, the City addresses only BHU's standing to pursue its ADA claims.

Standing is reviewed de novo because it is a question of law. *Isaacson v. Mayes*, 84 F.4th 1089, 1095 (9th Cir. 2023). "At the preliminary injunction stage, the plaintiffs must make a clear showing of each element of standing, relying on the allegations in their complaint and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden." *LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956-57 (9th Cir. 2021) (cleaned up). BHU has failed to meet this burden because it did not introduce sufficient facts in its complaint or evidentiary submissions to support associational or organizational standing. And it cannot do so, because its ADA claims inherently require individual BHU members to participate in the litigation.

## A. BHU Lacks Associational Standing

Organizations like BHU must establish either associational or organizational standing. *Satanic Temple v. Labrador*, 149 F.4th 1047, 1050-54 (9th Cir. 2025). Because BHU concedes that it does not assert organizational

standing, it must demonstrate associational standing.[7]  1-ER-70:9-23. An

entity has associational standing only when: (1) its members otherwise

would have standing to sue in their own right, (2) the interests it seeks to

protect are germane to the entity's purpose, and (3) neither the claim

asserted nor the relief requested requires the participation of the individual

members in the suit.  *Associated Gen. Contractors of Am., San Diego Chapter,*

*Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).

1. BHU Has Neither Alleged Nor Shown that Any Members Have
   Standing.

In finding that BHU met the first prong, the district court provided

no analysis, stating simply that "BHU easily satisfies the first two prongs of

the *Hunt* associational standing test" for all the claims without

---

[7] The district court did not address organizational standing, and BHU
disclaimed reliance on it, stating that it relied only on associational
standing.  6-ER-917-920; 1-ER-70:9-23. In any event, BHU lacks
organizational standing because it has put forth no facts showing that the
City's actions have interfered with its "core business activities." *See Food &
Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). A mere
setback to its "abstract social interests" is not enough. *Id.*

differentiating among them. 1-ER-128. But "[s]tanding is not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (cleaned up). "Just as an individual must demonstrate standing for each claim he seeks to press' and 'for each form of relief sought,' so too must an association that relies upon an individual member for standing." *Waskul v. Washtenaw Cnty. Community Mental Health*, 900 F.3d 250, 253 (6th Cir. 2018).

The district court therefore erred in finding standing without conducting the required claim-by-claim analysis. For example, in *Coalition on Homelessness v. City and County of San Francisco*, 758 F. Supp. 3d 1102, 1121–1122 (N.D. Cal. 2024), the court considered for each claim whether an association representing unhoused individuals had standing, concluding that it lacked standing for its ADA claims. The court explained that, although the complaint's allegations "support[ed] the general proposition that Coalition members include homeless individuals with disabilities," they were insufficient to show that such individuals had been injured by the city or had "individualized needs" that the city could accommodate. *Id.* at 1127-28.

*Coalition* demonstrates that, in the context of ADA Title II claims, the mere fact that an association has a member with a disability is not enough to confer standing. Rather, for each accommodation it seeks, an association must show that it has a disabled member who requires that accommodation to participate in a public program and was denied it by the public entity. *See Northland Parent Ass'n v. Excelsior Springs Sch. Dist. # 40,* 571 F. Supp. 3d 1104, 1114 (W.D. Mo. 2021) (association lacked standing to challenge mask mandate where it failed to identify member with condition warranting mandate exemption or show that any member had been denied exemption).

BHU was therefore required to identify, for *each* accommodation it seeks, a specific BHU member who requires that accommodation to participate in a City program and was denied it by the City. BHU has not done so. The Complaint is vague, alleging generally that BHU has disabled members without identifying their names or disabilities. 9-ER-1417-1438. Similarly deficient is the evidence BHU submitted in support of its PI motion: a single relevant declaration by a "BHU representative" that

sought a long list of accommodations for BHU members without identifying their names, disabilities or disability-related needs, or stating that the City denied them access to programs based on their disability. 6-ER-975-978. This is not enough to support standing. Even assuming BHU has a member with a disability of some kind, Article III does not give every disabled individual standing to sue for failure to accommodate disabilities they do not have. *Access 4 All, Inc.*, 458 F. Supp. 2d at 174 (citing *Steger*, 228 F.3d at 893). A blind individual, for instance, does not have standing to seek an accommodation to assist a hearing-impaired individual. *Id.* To allow such a claim would "allow a person who has experienced no injury, and thus has no concrete interest in particular ADA violations," to sue in violation of Article III. *Id.*

Because BHU failed to identify specific members and explain what accommodations they need and why they are needed, it lacks Article III standing for its ADA claims.

2. <u>BHU Has Not Established that the Interests It Seeks to Protect Are Germane to Its Purpose.</u>

While this Court need not reach the second or third prongs of the associational standing test, BHU did not meet its burden to satisfy those prongs, either.

Regarding the second prong, the district court once again erred in determining that BHU "easily satisfies" it without any analysis. BHU was required to make a "clear showing" through its complaint and any other evidence submitted with its motion that the interests it seeks to protect are germane to its purpose. *See LA All. for Hum. Rts.,*14 F.4th at 956-57.  It failed to do so. Because, as described above, neither the complaint nor the PI motion put forth any facts describing its organizational structure, the number of type of members, or how many members reside at the encampment, it did not meet the requirements of the second prong. *See Communities Against Toxics v. Armorcast Prods. Co., Inc.,* No. CV 14-5728 PA (FFMX), 2014 WL 12966008, at *3 (C.D. Cal. Nov. 12, 2014) (complaint failed to satisfy second prong without such facts).

3. <u>BHU's ADA Claims Require Individual Participation.</u>

Finally, BHU failed to satisfy the third prong of the associational standing test because it did not, and cannot, show that "neither the claim asserted nor the relief requested requires the participation of the individual members in the suit." *Assoc. Gen. Contractors*, 713 F.3d at 1194. To the contrary, a court cannot assess a failure-to-accommodate ADA claim without knowing individualized information about each disabled individual and their required accommodations. This fact-intensive inquiry necessarily requires the participation of individual members. *Northland Parent Ass'n*, 571 F. Supp. 3d at 1114 (association lacked standing for ADA claim because it required "particularized information" about students' disabilities and requested accommodations).

Strangely, the district court recognized this, acknowledging that because BHU's claims require "substantial individualized evidence," BHU did not "clearly satisfy" the third prong. 1-ER-127-129; 1-ER-71:23-82:4. Nonetheless, the court stated that it would "allow" BHU to bring claims on behalf of its members because the third prong is merely "prudential." 1-ER-127-129. This conclusion was erroneous for several reasons.

58

First, the district court cannot overlook the need for individual members' participation when it is not clear the association has members with Article III standing for all forms of relief it seeks. *See supra* at pp. 54-57. This is especially true here, where the nature of BHU's reasonable accommodation claims makes individualized participation particularly important. *See Wong*, 192 F.3d at 818 (reasonable accommodation claims require "fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations").

Second, the ADA does not authorize courts to overlook the need for individual participation. The Supreme Court has explained that because the third prong of the associational standing test is prudential, rather than a constitutional minimum, Congress can provide by statute that associations may sue even where individual participation would ordinarily be required. For instance, in *United Food*, the Supreme Court held that the WARN Act allows unions to sue for their members' damages even though ordinarily individualized assessment would be required. 517 U.S. at 558; *see also Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1113 (9th Cir. 2003)

59

(Protection and Advocacy for Mentally Ill Individuals Act of 1986 allows associations to sue despite need for individualized assessment). Here, in contrast, there is no indication the ADA allows associations to sue for accommodations for members when individualized inquiry is needed to prove liability. To the contrary, courts have underscored that the ADA requires individuals to participate in such cases because they are fact-intensive and individualized.

Because the participation of BHU's individual members is necessary to adjudicate BHU's ADA claims, BHU cannot sue on their behalf. The district court therefore should have dismissed BHU's ADA claims for lack of standing.[8] *See NetChoice, LLC*, 152 F.4th at 1014 (affirming dismissal of

---

[8] It does not matter that BHU is seeking only injunctive relief, rather than damages. While claims for injunctive relief may be less likely than damages claims to require participation of individual members, this is true only where plaintiffs seek to enjoin generally-applicable policies or programs. *See, e.g.*, *Nat'l Fed. of the Blind of Cal. v. Uber Techs., Inc.*, 103 F. Supp. 3d 1073, 1078–1079 (N.D. Cal. 2015). Where, as here, a claim for injunctive relief requires individualized proof to demonstrate *liability*, courts generally find standing lacking under the third prong, as the Ninth Circuit recognized in *NetChoice*. 152 F.4th at 1014.

association's claims under third prong because they required fact-intensive, individualized inquiry).

### III. The District Court Erred in Finding BHU Demonstrated a Likelihood of Success on Its ADA Claim

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits." *Winter v. Natural Resources Defense Council Inc.*, 555 U.S. 7, 20 (2008); *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982). Because the district court found that the hardship "does not tip decidedly in BHU's favor," BHU was required to demonstrate a likelihood of success on the merits of its ADA claim. 1-ER-127-129; *Winter*, 555 U.S. at 20. Further, the standard to obtain a mandatory injunction that requires the defendant to perform a specific act—such as the requirement that the City continue engaging in the interactive process—is "doubly demanding." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). A plaintiff must show that "the law and facts *clearly favor* [its] position, not simply that [it is] likely to succeed." *Id.*

The district court's finding that it did so was clearly erroneous for two overarching reasons. First, the court applied the wrong legal standard, basing its injunction not on the merits of BHU's ADA claim, but rather solely on its finding that some interactive process discussions were still pending, i.e., that the parties had not "completed" the process for all requestors. 1-ER-128. Such a claim is not cognizable under the ADA, nor should it be, as it would deprive public entities of well-established defenses. Second, had the court applied the correct legal standard, it would have recognized that BHU failed to prove the prima facie elements of an ADA failure-to-accommodate claim—i.e., the existence of a reasonable accommodation tailored to the unique needs of the member for whom it seeks the accommodation, and the City's failure to grant the request.[9] *See Memmer v. Marin Cnty. Cts.*, 169 F.3d 630, 633 (9th Cir. 1999). Even

---

[9] Strangely, the court simultaneously suggested that BHU was *unlikely* to prevail on the primary accommodations that BHU has sought throughout the interactive process, stating that BHU's requests for housing or for a sanctioned encampment "could well constitute a fundamental alteration of the City's program to abate and close the encampment or place a burden on the City which cannot be met." 1-ER-128.

assuming BHU had made out a prima facie case, the district court also failed to assess the City's fundamental alteration or undue burden defenses. 1-ER-127-129. This was clear error, and this Court should reverse.

### B. The District Court Misconstrued the Legal Standard for a Reasonable Accommodation Claim

The district court's preliminary injunction offers no legal support for its conclusion that "BHU is likely to succeed on its ADA claim that the City has not completed the interactive process to identify a reasonable accommodation for its members living in the Harrison Corridor for whom BHU has submitted accommodation requests." 1-ER-128. This unreasoned conclusion suffers from several clear legal defects.

First, Title II of the ADA does not impose stringent "interactive process" obligations on public entities. The interactive process derives from employment cases under Title I; they do not apply to Title II claims. As this Court has recognized, Congress deliberately distinguished Title I and Title II of the ADA. *Zimmerman v. Oregon Dept. of Justice*, 170 F.3d 1169, 1177–1183

(9th Cir. 1999). Duties under one Title thus cannot not be automatically read to apply to another. *See Tausher v. Phoenix Bd. Of Realtors, Inc.*, 931 F.3d 959, 964 (9th Cir. 2019) (finding that Title I's "interactive process" requirement does not apply under Title III). Title I's structured interactive process for employers, which includes for example reassignment and job restructuring, is therefore inapplicable to Title II accommodation requests. *Compare* 42 U.S.C. § 12111 et al.; *with* 42 U.S.C. § 12132 et al. While some engagement is necessary under Title II to determine whether a reasonable modification is possible, the ADA does not require it be conducted in a particular way or continue until a mutually-agreeable accommodation is identified.

Second, "there exists no stand-alone claim for failing to engage in the interactive process" even under Title I. *Snapp*, 889 F.3d at 1095. Rather, as "virtually every single other Circuit" has concluded, a plaintiff still must establish the existence of a reasonable accommodation that was denied *even if* a defendant fails to engage in the interactive process at all. *Ahmed v. Regents of Univ. of California*, No. 17-cv-0709-MMA (NLS), 2018 WL 3969699, at *5

(S.D. Cal. Aug. 20, 2018).[10] The court therefore erred by granting an injunction without finding that BHU met its burden to identify a reasonable accommodation that was denied.

Third, even if the interactive process were a basis for a stand-alone ADA claim, the district court did not find that the City *hadn't* engaged in the interactive process. It simply found that the BHU was "likely to succeed on its ADA claim that the City *has not completed* the interactive process." 1-ER-128. But pending interactive process discussions for a handful of association members who failed to timely provide supporting documentation does not prove a violation, let alone provide a basis for injunctive relief, and neither the district court nor BHU cited any authority that they are. Nor would that make sense: if that were the law, a disabled individual could simply request an accommodation, fail to supply requested documentation, and then move for a preliminary injunction. This would permit judicial interference even when public entities have

---

[10] *See, e.g., Stern v. St. Anthony's Health Ctr.,* 788 F.3d 276, 292 (7th Cir. 2015); *McElwee v. Cnty. of Orange,* 700 F.3d 635, 642 (2d Cir. 2012); *Minnihan v. Mediacom Commc'ns Corp.,* 779 F.3d 803, 813 (8th Cir. 2015)

committed no legal violations. There is no precedent for such a drastic

intrusion into public entities' ability to operate programs.

And that is for good reason. If a plaintiff could obtain injunctive relief

simply because the interactive process was ongoing, it would lead to

harmful consequences that Congress did not intend. Most significantly, it

would deprive Title II entities of their statutory right to assert certain

defenses. Both the fundamental alteration and undue burden defenses

depend on assessing the impact of a specific requested accommodation on

a public entity's programs and budget. *See Pierce v. Cnty. of Orange*, 526

F.3d 1190, 1217 (9th Cir. 2008). Granting the plaintiff injunctive relief before

the Title II entity can finish conducting this assessment for all requested

accommodations—as the district court did here—functionally nullifies

these defenses because it subjects the entity to legal liability even when it

could validly assert them under the ADA. *See Mayfield v. City of Mesa*, 131

F.4th 1100, 1110 (9th Cir. 2025) (explaining that even if an accommodation

is "denied or not provided," the defendant "may nonetheless defeat the

claim by showing that the plaintiff's proposed accommodation would

"fundamentally alter" the nature of the program or activity and is therefore not a reasonable accommodation). Additionally, if upheld, the district court's approach would pressure Title II entities into making premature or uninformed accommodation decisions to avoid injunctive relief, undermining the careful, program-specific analysis that Title II contemplates. This would transform ADA cases into disputes about timing and process rather than objective assessment of whether entities discriminated against disabled individuals.

For all of these reasons, the district court's injunction rests on a fundamentally incorrect understanding of the proper legal standard for assessing ADA claims. Had the court conducted the correct legal analysis based on the factual record, it would have been clear that BHU could not show likelihood of success on the merits, as explained below.

## C. The District Court Erred in Finding BHU Had Demonstrated a Likelihood of Success on Its Reasonable Accommodation Claim

To demonstrate likelihood of success on an ADA Title II claim, a plaintiff must show that (1) he is a qualified individual with a disability, (2)

he was excluded from participation in a public entity's services, programs, or activities, and (3) such exclusion was due to his disability. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). The third factor can be shown through a failure to provide a reasonable accommodation. *Updike v. Multnomah Cnty.*, 870 F.3d 939, 951 (9th Cir. 2017). To prevail on such a claim, a plaintiff must demonstrate "the existence of specific reasonable accommodations that [the City] failed to provide." *Memmer*, 169 F.3d at 633.

The district court committed clear error by finding that BHU met this high standard without even assessing whether BHU the City denied any BHU member a reasonable accommodation. As an initial matter, BHU's only argument below was that the City "constructively refused to engage in the interactive process for 19 BHU members by refusing to meet and engage the interactive process without medical information." 6-ER-963-970. It did not argue that the City failed to provide a reasonable accommodation and, as such, BHU waived this argument. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("As a general rule, we will not consider arguments that are raised for the first time on appeal.")

Even if it were not waived, the evidence BHU submitted in support of its motion does not show that the City denied any reasonable accommodations, much less that that the facts "clearly favor" BHU's position. The Declaration of Gordon Gilmore, mislabeled as the Declaration of Trista Taylor, provides no testimony whatsoever regarding BHU's accommodation requests or any other element of its Title II claim. 6-ER-971-974. The only other declaration, from Ms. Prado, states only that she submitted "over 21 requests for reasonable accommodations," seeking "individualized accommodations, including access to sanitation, portable water, mobility assistance, ADA-compliant shelter, executive functioning support, and transitional support before evictions" on behalf of unnamed BHU members in the Harrison Corridor. 6-ER-975-978. But Prado does not specify (1) which BHU members made these demands; (2) the limitations that these members face; (3) the dates on which they made those requests; or (4) the harm they would suffer absent an accommodation.

These glaring omissions should have been fatal to BHU's motion. Without this information, BHU cannot show that the members at issue are

"qualified individuals with disabilities" or that they were "excluded from participation" in the City's programs or services due to those disabilities. *See Lovell*, 303 F.3d at 1052. BHU likewise cannot, without this information, "establish the existence of *specific* reasonable accommodations that [the City] failed to provide." *Memmer*, 169 F.3d at 633 (emphasis added). Without identifying who everyone is and what accommodations they seek, BHU cannot succeed on its claims. *See Karkanen v. California*, No. 17-CV-06967-YGR, 2018 WL 3820916, at *5 (N.D. Cal. Aug. 10, 2018) (no ADA claim stated where "[p]laintiff does not explain what accommodations she requested, the dates and details of when and how she made the requests, or what accommodations were denied"); *Serris v. Chastaine*, No. 2:22-cv-0434-JAM-CKD PS, 2022 WL 2133900, at *4 (E.D. Cal. June 22, 2022) ("The main problem with plaintiff's ADA claim premised on a failure to accommodate is that it does not identify with specificity what reasonable accommodations were denied.").

The district court further erred by finding that BHU was likely to succeed without properly assessing the City's defenses. Even assuming a

plaintiff makes out a prima facie case, there is no legal violation where an accommodation would impose a "fundamental alteration in the nature of the program or undue financial or administrative burdens." *Giebeler v. M & B Assoc.*, 343 F.3d 1143, 1157 (9th Cir. 2003); s*ee also Tennessee v. Lane*, 541 U.S. 509, 538 (2004). BHU therefore cannot be likely to succeed on its ADA claims unless the court assesses the City's defenses and determines that its requested accommodations likely would *not* fundamentally alter a City program or impose undue burdens on the City. As the City argued, BHU's request to indefinitely occupy public land would fundamentally alter the nature of the City's abatement program, as this Court has squarely held. *See Caltrans*, 32 F.4th at 862. BHU's requests for "peer support worker" and "executive functioning support" services likewise would fundamentally alter the City's abatement program, as the City does not operate individualized relocation planning or peer-support programs and the ADA does not compel the City to create new programs as a reasonable accommodation. *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003). Notably, the district court did not disagree with this analysis, ruling that

BHU's requests "could well constitute a fundamental alteration" of the City's abatement program. 1-ER-127-129. It simply erroneously failed to factor it into its likelihood-of-success finding. *Id.*

Had the district court conducted a proper analysis, it would have found that BHU was unlikely to succeed on any of its ADA claims. The City provided prompt responses to all three requests before the district court, granting reasonable accommodations where possible, explaining why others did not qualify as reasonable accommodations, and asking for necessary nexus information for others. 6-ER-950-962. For instance, for some individuals, the City offered physical assistance with packing and lifting, and a pre-scheduled storage service—feasible forms of support that align with available resources and the ADA's requirements. *Id.* In contrast, for the requests to remain in the encampment, the City asked for clarification as to how long the campers intended to remain and nexus documentation establishing the link between their disabilities and requested accommodation. *Id.* The City requested these clarifications because a public entity has a duty to seek additional information about a disabled

individual's needs before denying a requested accommodation on fundamental alteration grounds. *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1136–37 (9th Cir. 2001) (quotation marks and citation omitted). Again, the district court did not take issue with the City's approach; it simply failed to consider it in making its merits finding. 1-ER-127-129.

At bottom, BHU's position is that BHU members must be permitted to remain at the encampment indefinitely or be placed in permanent "ADA-compliant" housing. But these are not reasonable accommodations, and "the ADA does not require an accommodation that an individual requests or prefers; instead, the ADA requires only a reasonable accommodation." *Chew v. Legislature of Idaho*, 512 F. Supp. 3d 1124, 1129 (D. Idaho 2021). The City did not fail to engage in the interactive process simply by not automatically granting individuals' preferred accommodations.

Because the district court did not, and could not, find that the City failed to provide reasonable accommodations, its injunction was clear legal error. *Snapp*, 889 F.3d at 1095.

**IV.    The District Court's Serial Extensions of the Injunction Violate Binding Ninth Circuit Precedent**

Even putting aside the numerous errors in the district court's initial injunction, its decision to extend the injunction three times until it lasted longer than six months clearly violates this Court's controlling decision in *Caltrans*. 32 F.4th at 865. *Caltrans* unequivocally held that the ADA does not empower courts to issue a six-month injunction delaying an encampment abatement to facilitate interactive process discussions. Such an injunction, *Caltrans* explained, inappropriately transforms an individual's right to a reasonable accommodation into a de facto entitlement to remain on public property. *Id.* Yet that is precisely what the district court has done again here.[11]

In *Caltrans*, this Court vacated an injunction that required Caltrans to delay clearing a critical encampment for six months to allow the parties to engage in the interactive process. 32 F.4th at 865. This Court held that such

_____

[11] Both this appeal and the one at issue in *Caltrans*, sought review of preliminary injunction orders from the same judge – District Court Judge Edward M. Chen.

a delay was a prohibited fundamental alteration under Title II because it impermissibly minimized the public safety purpose of the clearance and ignored how the balance of the hardships shifted over time in favor of closure. *Id*. at 864-65. The same is true here. The district court's injunction has contravened *Caltrans* by minimizing the safety risks that make "clearing [priority] encampments so critical," and by ignoring how these risks have grown over time. *Caltrans*, 32 F.4th at 862.

Notably, the district court has done so even against its own recognition that "[a]s an encampment continues over time and if health and safety hazards persist, the government's interest in closure increases." 1-ER-127. At the time the court issued the preliminary injunction, the City had documented years of public health and safety risks posed by the encampment including exposed sewage, scattered bloodied needles, unmitigated human and animal waste, rotting food, extensive rodent burrows, and frequent structure fires. 8-ER-1372-1379. These risks were akin to the risks to those in the *Caltrans* encampment that led Caltrans to deem closure to be critical. *See Caltrans*, 32 F.4th at 864. And like Caltrans,

the City deemed the closure of Harrison Corridor critical and attempted to

close it to address these public health risks. *Compare* 8-ER-1263-1282.

Nonetheless, the district court erroneously kept extending the

injunction without reassessing irreparable harm or the balance of the

equities. "[A] party seeking to extend a preliminary injunction must

establish its entitlement to relief" under the same *Winter* factors as a party

seeking an injunction in the first instance. *Rsch. Am., Inc. v. Simpson*, No. 23-

CV-320-LJV-HKS, 2024 WL 4633423 (W.D.N.Y. Oct. 31, 2024) (citing *Weight*

*Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 143 (2d Cir. 2005)). The

district court thus should have reassessed, at the time of each extension,

whether the conditions for an injunction were met. At a minimum, it

should have analyzed whether BHU would face irreparable harm absent an

extension or if the balance of the equities continued to favor BHU. *See*

*Winter*, 555 U.S. at 20.

The court's failure to do so constitutes a significant abuse of

discretion, especially considering that an injunction is an extraordinary

remedy. If it had re-analyzed the balance of the equities, it would have

found that they now tip in the other direction. Between the June injunction

and the court's latest extension and modification, the hazards posed by the

encampment have grown at an alarming pace.[12] Perhaps most significant is

the leptospirosis outbreak that has already led to animal deaths and can

cause severe harm, even death, to humans who contract it. 2-ER-194-212.

The City also introduced evidence that its staff and residents fear going to

the encampment. Campers have assaulted passersby, shot at neighboring

businesses' security cameras with bullets going through their windows,

started fires that damaged property, sliced fences with knives, shown up

naked or covered in feces on doorsteps, stolen property, and created

conditions that lead to damaged vehicles. 7-ER-1149, 6-ER-858, 2-ER-191-

192, 2-ER-186-189, 2-ER-183-185.  The encampment has also grown, spilling

into the road and making it impossible for emergency vehicles to drive. 2-

ER-190-193. These are the precise concerns the City intended to mitigate

_____

[12] The City has continued to remove trash and address public safety as they arise. But because the individuals protected by the district court's encampment are spread throughout the encampment, conducting an encampment-wide abatement that would address the persistent and overarching health concerns is operationally infeasible.

through the abatement scheduled to occur almost one year ago.

Indeed, the district court's prohibition is even more legally unsupportable than in *Caltrans*. While Caltrans did not provide people with housing solutions, the City makes a concerted effort to provide shelter to those living in Harrison Corridor. 8-ER-1263. *Caltrans* was also issued prior to the Supreme Court's *Grants Pass* decision, which made clear that the Eighth Amendment does not require shelter offers to clear an encampment. *City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520, 560 (2024). It is clear that BHU is attempting, in light of *Grants Pass*, to use the ADA to create a new right to shelter, but it has cited no authority to support this theory, and the district court itself has appeared to reject it, stating that ADA requests for "interim or permanent housing [] could well constitute a fundamental alteration of the City's program to abate and close the encampment or place a burden on the City which cannot be met." 1-ER-127-129. But instead of following this observation to its logical conclusion, the district court effectively allowed BHU to use the ADA to create a right to shelter by creating a right to indefinitely engage in the interactive

78

process under court supervision without any requirement for good-faith participation. This is contrary to law and a gross abuse of the district court's discretion.

In short, the district court committed reversible error by extending a preliminary injunction for at least seven months to force the City to allow the campers to remain in the public right of way as the dangers to residents, business, and visitors grew perceptibly.

## V.     The District Court's Modification of the Injunction Was Unlawful

Finally, the district court also committed reversible error by modifying the injunction on January 13, 2026, without analyzing whether any new facts or law justified it. "A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp*, 233 F.3d at 1170. Neither the City nor BHU brought forth evidence of a change in fact or law that warranted modifying the

injunction to end upon full resolution of BHU's claims rather than upon completion of the interactive process. The district court also did not weigh itself whether any new facts or law warranted its change to the injunction—it did not, for instance, make a new likelihood of success finding tied to the merits of BHU's claims, nor did it reassess balance of the equities or irreparable harm in light of the leptospirosis outbreak.

## CONCLUSION

For the foregoing reasons, this Court should vacate the preliminary injunction and order the district court to dismiss this case for lack of Article III standing.

Dated:  March 11, 2026

BERKELEY CITY ATTORNEY'S OFFICE

By:  */s/ Stephen Hylas*
      Stephen Hylas
      Deputy City Attorney
      Attorneys for City of Berkeley

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6(a), the undersigned counsel hereby attests that this case is related to *Berkeley Homeless Union v. City of Berkeley*, No. 25-7341, because it arises out of the same case in the district court.


Dated:  March 11, 2026           BERKELEY CITY ATTORNEY'S
                                 OFFICE

                                 By:  */s/ Stephen Hylas*
                                       Stephen Hylas
                                       Deputy City Attorney
                                       Attorneys for City of Berkeley

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 26-842

I am the attorney or self-represented party.

**This brief contains** 13,883 **words,** including 150 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Stephen Hylas    **Date** 3/11/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** | 26-842

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Frank Moore (pro se)
1349 Hearst Avenue
Berkeley, CA 94702

**Description of Document(s)** *(required for all documents)*:

Appellants' Opening Brief, Addendum and Excerpts of Record

**Signature** | Herschel Winheld | **Date** | 3/11/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 15** | *Rev. 12/01/2018*