Case Nos. 25-7341, 26-842, 26-2755, 26-2820, 26-2823, 26-6170, 26-6177

**United States Court of Appeals**
**for the Ninth Circuit**

Berkeley Homeless Union, et al.,

*Plaintiffs and Appellees,*

*v.*

City of Berkeley, et al.,

*Defendants and Appellants.*

Appeal from United States District Court
Northern District of California
U.S. District Court Case No. 3:25-cv-01414-EMC
and 3:23-cv-04537-EMC
The Honorable Edward M. Chen

# BRIEF OF AMICUS CURIAE THE LEAGUE OF CALIFORNIA CITIES IN SUPPORT OF DEFENDANTS AND APPELLANTS

**HANSON BRIDGETT LLP**
Sean Herman, SBN 302261
sherman@hansonbridgett.com
David C. Casarrubias-González, SBN 321994
dcasarrubias-gonzalez@hansonbridgett.com
Zahra Bocek, SBN 341819
zbocek@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
(415) 777-3200

*Attorneys for Amicus Curiae*
The League of California Cities

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae states as follows:

The League of California Cities has no parent company, and no publicly held corporation owns 10% or more of its stock.

## FRAP 29(a)(4)(E) STATEMENT

No party's counsel authored this brief in whole or in part, and no party, counsel or third party contributed money intended to fund preparing or submitting this brief other than pro bono support by amicus curiae's counsel.

# TABLE OF CONTENTS

**Page**


CORPORATE DISCLOSURE STATEMENT .......... 2

FRAP 29(A)(4)(E) STATEMENT .......... 2

INTEREST OF *AMICUS CURIAE* .......... 6

INTRODUCTION .......... 7

I. THE DISTRICT COURT'S FINDING OF ASSOCIATIONAL STANDING WAS LEGALLY DEFICIENT. .......... 13

II. THE DISTRICT COURT IMPROPERLY REDEFINED THE CITY'S PROGRAM UNDER THE ADA. .......... 15

  A. Providing assistance to encampment residents does not make sidewalk or street habitation a benefit of the City's program. .......... 16

  B. The district court's expansive program definition cannot replace the required showing that an accommodation is necessary and reasonable. .......... 17

  C. The ADA does not require modifications that fundamentally alter a city program. .......... 18

III. THE DISTRICT COURT IMPROPERLY APPLIED THE LEGAL STANDARD FOR THE CLAIMS ALLEGING A VIOLATION OF THE FOURTH AMENDMENT. .......... 20

  A. The Fourth Amendment does not impose a separate requirement to try or rule out alternatives to an otherwise reasonable impoundment. .......... 21

  B. The district court must consider whether a vehicle's continued presence presents a safety or health hazard. .......... 23

IV. THE DISTRICT COURT'S APPLICATION OF THE STATE-CREATED DANGER DOCTRINE WAS IMPROPER. .......... 24

  A. Plaintiffs failed to demonstrate that the City's action created a greater danger or caused particularized harm. .......... 26

  B. Plaintiffs failed to establish deliberate indifference. .......... 27

CONCLUSION .......... 29
CERTIFICATE OF COMPLIANCE .......... 30
CERTIFICATE OF SERVICE .......... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3Pak LLC v. City of Seattle*,
174 F.4th 1180 (9th Cir. 2026) .... 25

*Barden v. City of Sacramento*,
292 F.3d 1073 (9th Cir. 2002) .... 16

*Berkeley Homeless Union v. City of Berkeley*,
No. 25-7341, slip op. (9th Cir. Oct. 26, 2026) .... *passim*

*City of Grants Pass, Oregon v. Johnson*,
603 U.S. 520 (2024) .... 7

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989) .... 24

*McGary v. City of Portland*,
386 F.3d 1259 (9th Cir. 2004) .... 16

*Miranda v. City of Cornelius*,
429 F.3d 858 (9th Cir. 2005) .... 20, 21, 23

*Monell v. Dep't of Soc. Servs. of City of New York*,
436 U.S. 658 (1978) .... 20

*Murguia v. Langdon*,
61 F.4th 1096 (9th Cir. 2023) .... 25, 27, 28

*South Dakota v. Opperman*,
428 U.S. 364 (1976) .... 11, 20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .... 8, 14

*Townsend v. Quasim*,
328 F.3d 511 (9th Cir. 2003) .... 18

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 13

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) (*Good*) .......... 22

*Where Do We Go Berkeley v. Cal. Dep't of Transp.*,
32 F.4th 852 (9th Cir. 2022) .......... 15

*Wood v. Ostrander*,
879 F.2d 583 (9th Cir. 1989) .......... 27, 28

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 .......... 24

U.S. Const. art. III, § 2, cl. 1. Article III .......... 13, 14

**Statutes**

42 U.S.C. § 12132 .......... 15

**Regulations**

28 C.F.R. § 35.130(b)(7)(i) .......... 15

**Rules**

Fed. R. Civ. P. 56(a) .......... 28

Pursuant to Federal Rule of Appellate Procedure 29, amicus curiae submits this brief in support of Defendants and Appellants. All parties to these consolidated appeals have consented to the filing of this brief pursuant to Federal Rules of Appellate Procedure 29(a)(2).

## INTEREST OF *AMICUS CURIAE*

The League of California Cities (Cal Cities) is an association of 466 California cities dedicated to protecting and restoring local control to provide for the public health, safety, and welfare of their residents, and to enhance the quality of life for all Californians. Cal Cities is advised by its Legal Advocacy Committee, comprised of 27 city attorneys from all regions of the State. The Committee monitors litigation of concern to cities and identifies those cases that have statewide or nationwide significance. The Committee has identified this case as having such significance.

Cal Cities submits this brief because the challenged rulings threaten California cities' ability to remove hazardous encampments, maintain public rights-of-way, and otherwise protect the health, safety and welfare of the community. The district court's several rulings were expansive, unprecedented, and usurped cities' control over matters

uniquely suited to the discretion of local elected officials. For these reasons, Cal Cities supports the City's appeal and urges the Court to reverse and remand the district court's rulings.

## INTRODUCTION

The United States Supreme Court has expressly recognized that local governments may use reasonable public camping regulations to address encampments posing significant health and safety risks and encourage unhoused individuals to accept available alternatives. *City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520, 533 (2024). The circumstances here are precisely those the Supreme Court contemplated.

The dangerous conditions at the Harrison Street encampment in the City of Berkeley are well documented in both the record and media reports. Although the district court accepted the City's expert evidence establishing that the encampment posed serious public health risks warranting its closure (1-ER-133–135[1]), it prevented the City from abating those conditions and carrying out measures the public health

[1] Citations to ER refer to the excerpts filed July 27, 2026 (Dkt. 47). Citations to FER refer to the further excerpts filed October 23, 2026 (Dkt. 72).

officer deemed necessary to eliminate a significant public health threat. The injunctions thus impaired the City's ability to fulfill one of a city's most fundamental responsibilities: protecting the public's health, safety, and welfare.

The district court also erred in finding that Berkeley Homeless Union (BHU) had associational standing to sue on its members' behalf. The Supreme Court's test requires an organization to establish, among other things, that neither its claims nor the requested relief requires individual members' participation. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). The district court excused that requirement rather than requiring BHU to satisfy it.

The district court's rulings, which effectively hamstrung the City's response to a serious and deadly disease outbreak, rest on a fundamental misapplication of the law. Most notably, the court treated continued residence on public streets as a City benefit or program. That mistaken premise permeates its interpretation and application of the Americans with Disabilities Act (ADA) and constitutes a central error in these consolidated appeals.

The district court arrived at its conclusion by defining the relevant municipal "program" at an exceptionally high level of generality. Relying on the City's provision of housing and social services, its broad municipal mission, and the longstanding existence of encampments, the district court concluded that the City's program of maintaining functional, orderly, and safe streets and sidewalks encompasses their use as places for unhoused individuals to reside. 1-ER-123–125. But that reasoning conflates services provided to individuals residing *on* public property with provision of public property *as* housing.

A city's assistance to encampment residents does *not* turn continued occupation of public streets and sidewalks into a city benefit or program. Nor does its responsibility to manage and maintain public streets, sidewalks, and rights-of-way create a public benefit or a continued right to reside there.

Moreover, the mere existence of encampments on public property does not transform them into a *city* program, service, or activity. The district court's analysis on this point is both circular and self-reinforcing: because legal restrictions have prevented cities from removing encampments, encampments have remained in place; and

because they have remained in place, the district court concludes that cities must continue allowing public property to be used for residential purposes. The mere existence of encampments on public land cannot convert streets, sidewalks, and rights-of-way into a municipal housing program.

Cal Cities respectfully urges this Court to reject the district court's expansive concept of a city's "program" under the ADA. In contrast, the ADA analysis should have started with the services, programs and activities the City actually provides and the purposes they are intended to serve. The district court should then determine whether the requested accommodation is necessary to afford meaningful access to those services or activities, whether the accommodation is reasonable, and whether it would fundamentally alter the nature of the City's program.

The implications of the district court's approach to the ADA extend far beyond this case. If taken to its logical conclusion, the district court's reasoning means that an encampment becomes a city program simply by existing on public property, irrespective of local law, public input, or the decisions of a city's elected representatives. Further, any

city that combines encampment abatement efforts with outreach, housing assistance, or social services risks having necessary public health and safety measures delayed while the parties litigate the adequacy of those services. During that time, dangerous conditions may persist or worsen, including the spread of infectious disease, threats to public safety, and other harms that local governments are charged with preventing.

Furthermore, the district court's constitutional rulings regarding the community caretaking and state-created danger doctrines impose new and unprecedented legal barriers to encampment abatement, further restricting cities' ability to respond promptly and effectively to serious public health and safety hazards.

Under the Fourth Amendment's community caretaking doctrine, a city may tow a vehicle when removal is reasonably necessary to address a demonstrated public safety concern. *South Dakota v. Opperman*, 428 U.S. 364, 368–69, 371 (1976). Yet despite this settled standard, the district court imposed an additional requirement: that the City first show that less intrusive alternatives had been attempted or would be ineffective. Nothing in the governing precedent supports such a

condition. By layering this extra requirement onto the community-caretaking analysis, the district court risks delaying otherwise lawful and necessary action even when an immediate safety hazard warrants removal.

The district court likewise expanded the Fourteenth Amendment's state-created danger doctrine beyond its recognized limits. It restricted the City's ability to remove vehicles and tents from public property based upon the concern that individuals who lose a vehicle or a tent used as shelter may be exposed to the elements.

But the possibility that government action could leave a person in arguably more difficult circumstances does not, standing alone, establish a constitutional violation under the state-created-danger doctrine. If it did, virtually any effort to abate an encampment could give rise to liability. The district court's interpretation effectively transforms the state-created danger doctrine into a broad constraint on local government's ability to address dangerous conditions on public property, exposing cities to litigation whenever they take steps to protect the health, safety, and welfare of both encampment occupants and the broader community.

Finally, as the City aptly demonstrated in its supplemental brief, the district court's recent rulings far exceed its lawful authority and represent an unprecedented judicial intrusion into the authority of local governments to address matters uniquely within their responsibility and control.

Cal Cities respectfully urges this Court to correct these errors, vacate the challenged injunction provisions resting on them, and remand for faithful application of the governing standards. Properly applied, those standards balance the protections of the ADA and the Constitution with California cities' authority to maintain public rights-of-way, abate hazardous encampments, and protect the health, safety, and welfare of the communities they serve.

## I. THE DISTRICT COURT'S FINDING OF ASSOCIATIONAL STANDING WAS LEGALLY DEFICIENT.

Standing is determined based on the facts existing at the time the complaint is filed. U.S. Const. art. III, § 2, cl. 1. Article III "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

An organization may assert associational standing on behalf of its members only if it demonstrates that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and, (3) neither the claims asserted nor the relief requested require the participation of individual members in the litigation. *Students for Fair Admissions, Inc.*, 600 U.S. at 199.

Here, the district court inexplicably dispensed with the third requirement altogether. Rather than requiring Plaintiffs to establish each element necessary for associational standing, it effectively excused compliance with the third element in the test. As Judge Bumatay observed, the district court "so lowered the bar to associational standing that it effectively wiped away one third of its requirements." *Berkeley Homeless Union v. City of Berkeley*, No. 25-7341, slip op. at 15 (9th Cir. Oct. 26, 2026) (Bumatay, J., *concurring in part and dissenting in part*) ("Bumatay Op."). By disregarding a mandatory element of the associational-standing inquiry, the district court departed from settled Supreme Court precedent and erroneously conferred standing on an organization that failed to carry its burden under Article III.

## II. THE DISTRICT COURT IMPROPERLY REDEFINED THE CITY'S PROGRAM UNDER THE ADA.

Title II of the ADA requires public entities to make reasonable modifications when necessary to avoid disability discrimination, unless the modification would fundamentally alter the service, program or activity at issue. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7)(i). The threshold inquiry involves identifying the relevant program and evaluating the requested accommodation in that context. *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 860–62 (9th Cir. 2022).

The district court departed from that framework by treating the City's provision of outreach and social services, combined with the existence of encampments, as evidence that City streets and sidewalks function as a municipal residential program. 1-ER-123–125. That premise confused the condition the City seeks to address with a benefit the City provides. It also distorted the district court's ADA accommodation analysis that followed. This Court should reject that premise and require each accommodation to be evaluated against the City's actual services, activities, and programs.

### A. Providing assistance to encampment residents does not make sidewalk or street habitation a benefit of the City's program.

The district court relied on two facts: the City provides housing and social services, and unhoused individuals have long resided on public property. Neither supports the conclusion that public street or sidewalk habitation is a municipal program.

Providing services to people living on public property by no means makes the public property itself a benefit of a city program. Nor does the mere presence of encampments on public property create a city housing program or service. A city's obligation to manage and maintain streets, sidewalks and rights-of-way cannot be transformed into a legal entitlement to live on those public properties.

The proper inquiry under the ADA is whether a disabled person requires an accommodation to access an existing City service or comply with a City requirement. *Barden* and *McGary* fit that framework. *Barden v. City of Sacramento*, 292 F.3d 1073, 1076–78 (9th Cir. 2002); *McGary v. City of Portland*, 386 F.3d 1259, 1268–70 (9th Cir. 2004). But shelter referrals, storage assistance, transportation assistance or

relocation support provided during an abatement do not establish that continued occupancy of public property is *itself* a city benefit.

This matters to cities throughout California. Under the district court's reasoning, a city's efforts to assist encampment residents could become evidence that a city has created a public-residency program subject to additional ADA restrictions. That approach risks discouraging cities all across the state from coordinating outreach and supportive services with encampment abatement. The ADA requires equal access to city services; it does not require cities to treat continued residence on public streets and sidewalks as a municipal program.

### B. The district court's expansive program definition cannot replace the required showing that an accommodation is necessary and reasonable.

By defining street habitation as a municipal benefit, the district court treated encampment removal as a potential denial of access to a City program. But (erroneously) labeling continued occupancy a "program" or "benefit" does not establish that a particular accommodation is necessary because of a disability.

The ADA requires an individualized inquiry. Courts must identify the city service at issue, determine how a disability impedes access to

that service, and evaluate whether the requested modification is reasonable. *Townsend v. Quasim*, 328 F.3d 511, 517–20 (9th Cir. 2003). The district court's broad program definition short-circuited that analysis.

As Judge Bumatay observed, "[t]he district court tried to bake the reasonableness of the accommodations into the program definition itself." Bumatay Op. at 41. By doing so, it also obscured the separate question whether delaying or limiting abatement would fundamentally alter the City's public health and safety operations.

Any request that the City provide relocation assistance, additional time, or other accommodations must therefore rest on a demonstrated disability-related need and an evaluation of how the modification affects the City's actual operations. Such analysis is lacking in the district court's rulings.

### C. The ADA does not require modifications that fundamentally alter a city program.

Encampment abatements are often undertaken to address serious health and safety hazards. Delaying those efforts may prolong residents' exposure to dangerous conditions and prevent a city from

carrying out necessary remediation. Reasonableness therefore cannot be evaluated in isolation from the purpose of the abatement itself.

The ADA requires reasonable accommodation, not indefinite postponement of important public health or safety measures. Any requested modification of a service, program, or activity must be evaluated in light of its duration, its effect on the City's response to recognized hazards, and whether it would fundamentally alter the City's ability to maintain public health, safety, and access to public rights-of-way.

Here, the district court credited evidence that closure of the Harrison Street encampment was necessary to address a significant public-health threat. 1-ER-133–137. While that finding does not foreclose all accommodation requests, it required the district court to weigh the effect of any requested delay on the City's ability to eliminate the identified hazard. The district court's rulings do not include any such analysis.

Delaying abatement of the Harrison Encampment, which poses significant public health hazards, constituted a fundamental alteration

of the City's program, and the district court's ruling requiring a years-long delay in abatement must be reversed.

## III. THE DISTRICT COURT IMPROPERLY APPLIED THE LEGAL STANDARD FOR THE CLAIMS ALLEGING A VIOLATION OF THE FOURTH AMENDMENT.[2]

The Fourth Amendment permits cities to impound vehicles when doing so reasonably serves a genuine community caretaking need, such as removing a traffic obstruction or addressing a public-safety hazard. *Miranda v. City of Cornelius*, 429 F.3d 858, 864–65 & n.6 (9th Cir. 2005).

As Judge Bumatay observed,

> "Contrary to the district court's view, the Fourth Amendment permits police to 'remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic.' *Opperman*, 428 U.S. at 369. 'Mere' parking violations *are* enough—illegally parked vehicles can impede lawful business operations, and police are authorized to prevent that harm. The same goes for violations of other regulations."

Bumatay Op. at 28.

---

[2] Notably, the district court bypassed the applicable legal standard for determining the City's liability for constitutional claims under *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 694 (1978). This is an independent ground for reversal.

When a vehicle must be moved to avoid a hazard, the Fourth Amendment does not impose a separate requirement to pursue less intrusive alternatives. *Miranda*, 429 F.3d at 865 n.6.

Inexplicably, the district court imposed that additional requirement here, further complicating the City's reasonable efforts to abate the dangerous encampment. According to the district court's rulings, before impounding a vehicle used as shelter, the City must pursue measures such as cleaning, pest treatment, containment, and assisted relocation, or explain with particularity why those measures would be ineffective for that vehicle and occupant. 1-ER-148–149, 175–176. The permanent injunction extends those conditions to vehicles used as shelter by BHU members throughout the City. 1-FER-87–88. These conditions are unprecedented, alarming, and inappropriate.

### A. The Fourth Amendment does not impose a separate requirement to try or rule out alternatives to an otherwise reasonable impoundment.

The district court improperly grafted a new requirement onto the community-caretaking doctrine and, in so doing, created a test that is inconsistent with precedent. *See* Bumatay Op. at 26–30. Even after establishing a legitimate safety need for removal, the City was required

to undertake the district court's prescribed remedial measures or demonstrate why they would fail. The decision in *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993) (*Good*), provides no support for that additional step. *See* 1-ER-147. There, the Supreme Court considered whether the government could seize real property for civil forfeiture without first providing notice and a hearing, and required consideration of alternatives only to determine whether pre-seizure was necessary. 510 U.S. at 56–59, 62. *Good* did not require the government to exhaust alternative remedies before impounding a vehicle under the community-caretaking doctrine.

By conditioning an otherwise reasonable impoundment on the City's prior use or rejection of alternative measures, the district court imposed a requirement unsupported by *Good* and inconsistent with the community caretaking doctrine's purpose of allowing cities to address public-safety hazards promptly.

The district court's ruling has broad implications because it could unnecessarily and unlawfully impede cities' ability to address hazards to the public's health and safety in public rights-of-way.

### B. The district court must consider whether a vehicle's continued presence presents a safety or health hazard.

*Miranda* directs courts to consider both the vehicle's location and whether impoundment serves a legitimate caretaking purpose. 429 F.3d at 864–66. That inquiry must account for the safety work its presence impedes. Cleaning or treating a vehicle, for example, may do nothing to allow access to contaminated ground, pest-infested areas, or other hazards beneath or around it.

Here, the district court credited expert evidence that full closure of the encampment was necessary to address leptospirosis and other hazardous conditions. 1-ER-133–135. These findings establish a legitimate caretaking objective: the existence of the vehicle at the encampment prevented the City from abating a public health hazard and impoundment was a reasonable means of addressing the situation. The inquiry should have ended there.

Requiring cities to undertake alternative measures before an otherwise reasonable impoundment delays remediation while leaving identified health and safety risks unaddressed.

This Court should vacate the unprecedented Fourth Amendment conditions the district court imposed insofar as they require the City to attempt or rule out alternative remedial measures before an otherwise reasonable impoundment. On remand, the district court should evaluate impoundment based on the demonstrated caretaking need, including whether the vehicle's continued presence prevents the City from addressing public health or safety hazards.

## IV. THE DISTRICT COURT'S APPLICATION OF THE STATE-CREATED DANGER DOCTRINE WAS IMPROPER.

The Fourteenth Amendment prohibits states from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. It generally does not require the government to protect people against dangers it did not create. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–97 (1989). In dicta, the Supreme Court recognized two possible exceptions: when the state takes an individual into custody or when it affirmatively places an individual in greater danger than that which would have existed absent state action. *Id.* at 199–201. The latter exception has become known as the state-created danger doctrine.

To establish liability under that doctrine, a plaintiff must show more than governmental action that created or increased a risk of harm. The plaintiff must also demonstrate that officials recognized an unreasonable risk and acted with deliberate indifference to its consequences. *Murguia v. Langdon*, 61 F.4th 1096, 1110–12 (9th Cir. 2023). Moreover, the doctrine is concerned with threats to life or liberty, not economic or property interests. *3Pak LLC v. City of Seattle*, 174 F.4th 1180, 1185 (9th Cir. 2026).[3]

Consistent with the Supreme Court's admonition that substantive due process should be applied sparingly, this Court has been reluctant to expand the state-created danger doctrine and has exercised caution when asked to extend its reach. *3Pak LLC v. City of Seattle*, 174 F.4th 1180, 1185–86 (9th Cir. 2026). As Judge Bumatay noted,

> "Given its judge-made origin, we shouldn't so easily expand its reach. But that's what the district court did. It crafted an injunction based on speculative, non-particularized injuries and didn't grapple with Berkeley's need for abatement."

Bumatay Op. at 41.

---

[3] The decision in *3Pak LLC* demonstrates the unreasonableness of the district court's rulings requiring the City to purchase property for plaintiffs.

### A. Plaintiffs failed to demonstrate that the City's action created a greater danger or caused particularized harm.

Plaintiffs contend that removal of tents or vehicles would expose them to the elements or other risks associated with living outdoors. But reasonable encampment abatement undertaken to enforce health and safety laws or restore public access to public rights-of-way is not the type of affirmative conduct that supports a state-created danger claim under the Fourteenth Amendment.

The record demonstrates the City's extensive efforts to mitigate harm to encampment residents. Given those efforts, it was incumbent upon Plaintiffs to show that abatement created a particularized, foreseeable danger greater than the dangers already present in the encampment itself. They failed to do so.

Cities do not create the hazards inherent in living outdoors. Those existing hazards must be considered when determining whether abatement of an encampment increases risk so as to trigger substantive due process liability.

Although the district court recognized that significant health and safety hazards can justify removal of a vehicle encampment, it

incorrectly suggested that such hazards become legally significant only after a resident refuses remedial assistance. 1-ER-150. The severity of a hazard does not depend on whether assistance is accepted, particularly where a vehicle may provide shelter while simultaneously exposing its occupant to serious health or safety risks.

The district court's error is especially consequential because the permanent injunction extends the vehicle-removal restrictions to BHU members throughout the City. 1-FER-87–88.

### B. Plaintiffs failed to establish deliberate indifference.

The district court identified no evidence establishing the deliberate indifference required for a state-created danger claim. 1-ER-131, 149–150.

An inquiry into deliberate indifference focuses on what officials knew about dangers a plaintiff would face following the government's action, and whether officials consciously disregarded those dangers. *See Murguia*, 61 F.4th at 1111, 1117 n.16. That analysis must account for a city's efforts to address identified risks, including available outreach, storage, and possibly other assistance. *See Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989). While offers of assistance do not automatically

defeat a claim, they are highly relevant to whether officials knowingly disregarded a known risk. *See Murguia*, 61 F.4th at 1111; *Wood*, 879 F.2d at 590.

Because BHU moved for summary judgment, the evidence had to establish deliberate indifference without any genuine dispute of material fact. Fed. R. Civ. P. 56(a). The district court therefore was required to explain how the undisputed evidence showed that City officials knew of and disregarded a substantial risk of harm. Its general observation that the loss of vehicular shelter may expose someone to harm does not satisfy that burden.

Accordingly, this Court should vacate the state-created-danger ruling and the portions of the injunction predicated on that ruling. On remand, the district court should determine whether the challenged abatement activities created or increased a particularized danger and whether the City officials knowingly disregarded that danger. Any relief supported by separate ADA or constitutional grounds should be evaluated under the standards governing those claims.

# CONCLUSION

Cal Cities respectfully requests that this Court reverse the challenged ADA, Fourth Amendment, and state-created-danger rulings to the extent they rest on the errors identified above, vacate the corresponding provisions of the injunctions under review, and remand for faithful application of the governing standards and relief tailored to established violations.

Dated: October 29, 2026

HANSON BRIDGETT LLP

By: */s/ Zahra Bocek*

Sean Herman
David C. Casarrubias-González
Zahra Bocek

*Attorneys for Amicus Curiae*
The League of California Cities

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 4,088 words as counted by the Microsoft Word processing program used to prepare this brief. The Amicus Brief is also proportionally spaced, has a typeface of 14 points or more and complies with FRAP 32(a)(5) and (6).

Dated: October 29, 2026

HANSON BRIDGETT LLP

By: */s/ Zahra Bocek*
Sean Herman
David C. Casarrubias-González
Zahra Bocek

*Attorneys for Amicus Curiae*
The League of California Cities

## Certificate of Service

I hereby certify that on October 29, 2026, I electronically filed **BRIEF OF AMICUS CURIAE THE LEAGUE OF CALIFORNIA CITIES IN SUPPORT OF DEFENDANTS AND APPELLANTS** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ACMS system.

I certify that participants in the case who are registered CM/ACMS users will be served by the appellate CM/ACMS system.

Dated: October 29, 2026

HANSON BRIDGETT LLP

By: */s/ Zahra Bocek*
Sean Herman
David C. Casarrubias-González
Zahra Bocek

*Attorneys for Amicus Curiae*
The League of California Cities