Nos. 25-7341, 26-842, 26-2820, 26-2755, 26-2823, 26-6170, 26-6177

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

BERKELEY HOMELESS UNION, ET AL.,
*Plaintiffs-Appellees*,

v.

CITY OF BERKELEY, ET AL.,
*Defendants-Appellants.*

---

YESICA PRADO, ET AL.,
*Plaintiffs-Appellees*,

v.

CITY OF BERKELEY,
*Defendant-Appellant.*

---

Appeals from the U.S. District Court
for the Northern District of California
Case Nos. 3:25-cv-01414, 3:23-cv-04537 | Hon. Edward M. Chen

---

# [PROPOSED] BRIEF OF AMICUS CURIAE BAY AREA COUNCIL IN SUPPORT OF CITY OF BERKELEY AND REVERSAL

---

Bradley J. Hamburger
Patrick J. Fuster
Allison Roy Kawachi
Blake J. Hirst
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Amicus Curiae Bay Area Council*

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE .......... 1

SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 6

I. Homelessness is a crisis of enormous scale and human cost in the Bay Area and Berkeley .......... 6

A. California is the epicenter of the homelessness crisis. .......... 7

B. The Bay Area's homelessness problem is massive and persistent. .......... 11

C. The district court's orders threaten the City's progress towards meaningful homelessness solutions. .......... 15

D. The district court's orders have resulted in real-world harm at the Harrison Street encampment. .......... 18

II. The district court hampered the City's ability to address homelessness through a series of legal errors. .......... 20

A. The district court's orders reconstructed the regime that *Grants Pass* dismantled. .......... 21

B. The district court misapplied the ADA. .......... 24

C. The district court granted class-wide relief without the procedural safeguards of Rule 23 .......... 28

CONCLUSION .......... 30

CERTIFICATE OF COMPLIANCE .......... 31

CERTIFICATE OF SERVICE .......... 32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barden v. City of Sacramento*,
292 F.3d 1073 (9th Cir. 2002) .......... 25

*City of Grants Pass v. Johnson*,
603 U.S. 520 (2024) .......... 2–4, 6, 20–24, 27, 29, 30

*Cohen v. City of Culver City*,
754 F.3d 690 (9th Cir. 2014) .......... 25

*Martin v. City of Boise*,
920 F.3d 584 (9th Cir. 2019) .......... 22

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 5, 28, 29

## Rules

Fed. R. Civ. P. 23 .......... 5, 6, 28, 29

## Regulations

28 C.F.R. § 35.133(a) .......... 25

28 C.F.R. § 35.151(b) .......... 25

28 C.F.R. § 35.151(i) .......... 25

## Other Authorities

Alameda Cnty. Health Care for the Homeless & Cmty. Assessment, Planning & Evaluation, *Alameda County Homeless Mortality Report, Calendar Year 2024: Executive Summary* (2025) .......... 8, 9

Alastair Boone, *Alameda County PIT Count Shows Decrease in Homelessness*, KALW (May 20, 2026) .......... 17

Ann Rubin, *San Jose Reports 32% Drop in Homeless Population with New Tracking Model*, KTVU FOX 2 (Sept. 16, 2026) .......... 13

Cal. Health Care Found., *People Experiencing Homelessness in California*, Cal. Health Care Almanac (Oct. 2024) .......... 27

Christian Leonard, *Bay Area Homelessness Is Declining—Except in This County*, S.F. Chron. (July 24, 2026) .......... 12

City of Berkeley, *Coordination and Compassion: Berkeley's Response to Homelessness*, *attached to* Memorandum from Paul Buddenhagen, City Manager, City of Berkeley, to Honorable Mayor & Members of the City Council, *Berkeley's Response to Homelessness: New Materials Tell the Story of the City's Success* (Oct. 2, 2024) .......... 17

City of Berkeley, *Measures P and W: Real Property Transfer Tax to Fund Homeless Services* (last visited Oct. 29, 2026) .......... 17

Ctrs. for Disease Control & Prevention, *About Leptospirosis* (Feb. 10, 2026) .......... 19

Ctrs. for Disease Control & Prevention, *FastStats: Life Expectancy* (last updated Sept. 29, 2026) .......... 8

Grant Parks, *Homelessness in California: The State Must Do More to Assess the Cost-Effectiveness of Its Homelessness Programs*, Rep. No. 2023-102.1 (2024) .......... 10, 11

Guy Marzorati, *San José Council Approves Mahan's Shelter Enforcement Plan*, KQED (June 11, 2025) .......... 13

Guy Marzorati, *Tiny Homes, Big Ambitions: Matt Mahan's Run for Governor Spotlights His Shelter Strategy*, KQED (Feb. 17, 2026) .......... 13

*Homelessness in Contra Costa County Has Increased by 18.5% Since 2023*, CBS News Bay Area (June 1, 2024) .......... 12

Jill S. Roncarati et al., *Mortality Among Unsheltered Homeless Adults in Boston, Massachusetts, 2000–2009*, 178 JAMA Internal Med. 1242 (2018) .......... 9

Kasia Pawlowska, *New Data Shows California's Homelessness Problem Is Only Getting Worse*, SFGATE (Jan. 7, 2025) .......... 11

Legis. Analyst's Off., *The 2023-24 Budget: Updates on Recent Housing and Homelessness Augmentations and Overview of Proposed Budget Changes* (2023) .......... 10

Legis. Analyst's Off., *The 2025–26 California Spending Plan: Housing, Homelessness, and Local Government* (Oct. 22, 2025) .......... 10

Margot Kushel & Tiana Moore, UCSF Benioff Homelessness & Hous. Initiative, *Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness* (2023) .......... 7–10

Memorandum from Dee Williams-Ridley, City Manager, City of Berkeley, to Honorable Mayor & Members of the City Council, *As Shelter and Permanent Housing Investments Have Increased, Berkeley's Homelessness Has Declined* (May 16, 2024) .......... 16

Memorandum from Paul Buddenhagen, City Manager, City of Berkeley, to Honorable Mayor & Members of the City Council, *Implementation of Berkeley's New Encampment Policy* (Oct. 7, 2024) .......... 16

Noemi Doohan & Scott Gilman, City of Berkeley Health, Hous. & Cmty. Servs. Dep't, *City of Berkeley Public Health Alert: Addressing Leptospirosis at Harrison Street Encampment* (Jan. 12, 2026) .......... 19

Noemi Doohan & Scott Gilman, Berkeley Health, Hous. & Cmty. Servs. Dep't, *City of Berkeley Public Health Update: Addressing Leptospirosis at Harrison Street Encampment* (June 10, 2026) .......... 19

Press Release, City of Mountain View, *City Statement: 2025 Santa Clara County Point-in-Time Count* (Sept. 23, 2025) .......... 12

Press Release, Off. of the Mayor, City & Cnty. of S.F., *Mayor Lurie Announces San Francisco Has Reached Lowest Level Of Unsheltered Homelessness In 15 Years* (May 12, 2026) .......... 14

Press Release, Off. of the Mayor, City & Cnty. of S.F., *Mayor Lurie Signs Legislation to Expand Drug-Free Permanent Supportive Housing, Building on Progress of Breaking the Cycle Plan* (July 29, 2026) .......... 15

Press Release, Off. of the Mayor, City & Cnty. of S.F., *San Francisco Receives $18.2 Million Project Homekey Grant to Support Adding New Permanent Supportive Housing* (Nov. 9, 2023) .......... 14

Press Release, Off. of Sen. Josh Becker, *Governor Signs the Interim Housing Act, Giving Cities and Counties Proven Tools to Address Homelessness* (Sept. 19, 2024) .......... 13

Santa Clara Cnty., *Point-in-Time Count Community Report 2025* (2025) .......... 11, 12

S.F. Dep't of Homelessness & Supportive Hous., *2024 Point-in-Time Count*, S.F. Gov. (Sept. 6, 2024) .......... 12

Supriya Yelimeli, *Berkeley's Homeless Population Dropped 5% During the Pandemic, Report Says*, Berkeleyside (May 16, 2022) .......... 15

U.S. Dep't of Hous. & Urb. Dev. Off. of Cmty. Plan. & Dev., *The 2025 Annual Homelessness Assessment Report (AHAR) to Congress, Part 1: Point-in-Time Estimates of Homelessness* (2026) ........ 7

Vicente Vera*, 'The Usual' Location: Fires Plague Berkeley Homeless Camp*, Berkeley Scanner (Sept. 10, 2026) ........ 20

Whitney Thurman et al., *"The System Tends to Scoop You Up and Spit You Out and They're Done With You": The Intersection of Intellectual/Developmental Disability and Homelessness From the Perspectives of Service Providers*, 33 Qualitative Health Rsch. 1017 (2023) ........ 27

## INTEREST OF AMICUS CURIAE*

The Bay Area Council is a business-sponsored public policy advocacy organization representing more than 380 of the largest employers and civic organizations across the San Francisco Bay Area. Since its founding in 1945, the Council has worked to make the Bay Area the world's most innovative, globally competitive, inclusive, and sustainable region. Homelessness is one of the Council's core policy priorities, alongside housing; transportation; public safety; and water, energy, and climate. The Council monitors litigation that may affect the region and participates in cases that bear directly on those priorities.

This is such a case. The Council has long advocated for giving governments the flexibility they need to bring homeless residents indoors to protect their own health and safety and to keep streets, sidewalks, and other public spaces safe and accessible. The Council's members employ, serve, and do business with residents of Berkeley and its neighboring

---

* No party's counsel authored this amicus brief in whole or in part, and no party, party's counsel, or any person other than the Council, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief. The City, Berkeley Homeless Union, and Ms. Prado have consented to the filing of this amicus brief.

cities. They see firsthand the human and public costs of unsheltered homelessness. The Council has a strong interest in ensuring that local governments have the flexibility to address this critical public policy issue without being hampered by unlawful and counterproductive federal-court injunctions.

## SUMMARY OF ARGUMENT

Two years ago, the Supreme Court confronted whether the Eighth Amendment "grants federal judges primary responsibility for assessing" the causes of homelessness and devising the "public policy responses required to address it." *City of Grants Pass v. Johnson*, 603 U.S. 520, 560 (2024). The Court answered that it does not. As the Court explained, "a handful of federal judges" cannot "begin to 'match' the collective wisdom the American people possess in deciding 'how best to handle' a pressing social question like homelessness." *Id.*

The theories in this case are different, but the fundamental problems remain the same. The orders on appeal illustrate that federal judges are (still) not equipped to superintend homelessness policy and countermand decisions of local governments on core questions of public health and safety. Ripping homelessness policy from the hands of

Berkeley's elected leaders, the district court has issued a series of injunctions that micromanage the City's response to a complex policy problem. Those injunctions reflect a worldview that federal judges—not elected officials—should decide how large the tents of Berkeley's disabled homeless residents may be, which sidewalks must accommodate them, and whether the City may enforce its own no-camping designations. The district court has all but reconstructed the regime that *Grants Pass* swept away, this time under the Americans with Disabilities Act. Congress never could have fathomed that the ADA would be twisted to justify stripping a local government of its ability to manage homelessness.

Although the consequences are bad enough for those living in and near the crime-ridden and disease-infested Harrison Street encampment, the stakes of this litigation extend well beyond Berkeley. California is home to nearly a quarter of the nation's unhoused population. In 2024, the Bay Area counted nearly 39,000 people experiencing homelessness. But the region has made measurable progress against homelessness through strategies tailored to each community. San José, for example, has made significant investments in interim shelter and encampment resolution, while San Francisco has focused largely on behavioral health

and drug-free supportive housing. After all, our system of federalism allows communities to "experiment" along the way to "find[ing] certain responses more appropriate for some communities than others." *Grants Pass*, 603 U.S. at 560.

Berkeley, too, was among the success stories, reducing the number of unsheltered people experiencing homelessness by nearly half between 2022 and 2024. But since the district court's intervention in Berkeley's management of homelessness, its progress has stalled. And the conditions of its streets—including a deadly leptospirosis outbreak—have continued to deteriorate while the City litigates. As this case shows, the district court's orders threaten hard-won improvements across the Bay Area. These appeals now are an opportunity for this Court to correct course on three legal errors that have conspired to frustrate Berkeley's ability to manage its own homelessness policy.

First, the district court disregarded the central lesson of *Grants Pass*, which rejected this Court's line of cases holding that enforcement of generally applicable anti-camping ordinances against the homeless violates the Eighth Amendment. The Supreme Court explained that the test this Court had adopted had "proven all but impossible to administer

in practice," as "sometimes happens with abstract rules created by those far from the front lines." 603 U.S. at 553. In issuing a series of injunctions that dictated Berkeley's homelessness policy, the district court repeated that same error.

Second, the district court misapplied the ADA. It defined the City's Title II program to include the use of sidewalks as "locations of abode for the unhoused." 1-ER-124. That mistaken premise converts Berkeley's sidewalks into living space at the expense of pedestrians with mobility and vision disabilities, subverting the ADA's intent.

Third, the district court granted class-wide relief without the procedural protections of Rule 23. The district court's injunction applies to "all BHU members, wherever situated within the City," 1-FER-87—a group that is undefined, self-declared, and continues to grow even after judgment. Relief of that breadth is the functional equivalent of the universal injunctions the Supreme Court disapproved in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), and it gives Plaintiffs the benefits of a class action while depriving the City of Rule 23's protections. Without a properly certified class, no one can say whom the City must accommodate.

The Eighth Amendment does not authorize federal judges to "wrest [the] rights and responsibilities" of creating and administering homelessness policy "from the American people and in their place dictate this Nation's homelessness policy." *Grants Pass*, 603 U.S. at 560. Neither does the ADA. This Court should reverse.

## ARGUMENT

The homelessness crisis in California—and in the Bay Area and Berkeley in particular—is immense. Local governments have made progress against it with strategies tailored to their communities. The district court's orders threaten that progress by ignoring the central lesson of *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024), misconstruing the ADA, and awarding class-like relief without any of the procedural safeguards of Rule 23.

### I. Homelessness is a crisis of enormous scale and human cost in the Bay Area and Berkeley.

While many local governments in the Bay Area, including Berkeley, have developed effective strategies to combat homelessness, the district court's series of injunctions threatens the significant progress Berkeley has made. The status quo, if left in place, threatens to harm all Berkeley residents, whether homeless or not.

### A. California is the epicenter of the homelessness crisis.

California's homeless population accounts for around 24% of the nation's unhoused people.[1] Of that population, almost two-thirds sleep on the streets each night, making California's rate of unsheltered people experiencing homelessness the highest in the country.[2] Roughly 64,700 Californians are chronically homeless, meaning they have been dealing with homelessness for at least a year and have a disabling condition.[3]

Homelessness falls hardest on the most vulnerable Californians. California's homeless population includes over 8,000 unaccompanied youths and over 8,500 veterans.[4] Over 80% of homeless Californians have experienced mental-health issues and over one-quarter have been

[1] U.S. Dep't of Hous. & Urb. Dev. Off. of Cmty. Plan. & Dev., *The 2025 Annual Homelessness Assessment Report (AHAR) to Congress, Part 1: Point-in-Time Estimates of Homelessness* 1, 6 (2026) [hereinafter *AHAR*], https://perma.cc/SE5G-669R.

[2] *Id.* at 7.

[3] *Id.* at viii, 73; Margot Kushel & Tiana Moore, UCSF Benioff Homelessness & Hous. Initiative, *Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness* 24 (2023), https://perma.cc/D4QA-G3C3.

[4] *AHAR*, *supra* note 1, at 73.

hospitalized for mental-health-related problems.[5] Almost two-thirds report having used illegal substances, including amphetamines, opioids, and cocaine, regularly.[6] Seventy-two percent of homeless Californians reported being victims of physical violence at some point in their lives.[7] The homeless population is also an aging one: almost half of all homeless people in California are over 50, with the proportion of older homeless adults steadily increasing.[8]

Homelessness is also deadly. In Alameda County alone, 2,177 homeless people died between 2018 and 2024.[9] The median age of death is just 54—more than 20 years younger than the life expectancy of the general population.[10] The most common cause of death among Alameda

---

[5] Kushel & Moore, *supra* note 3, at 26.

[6] *Id.* at 28.

[7] *Id.* at 26.

[8] *Id.* at 21.

[9] Alameda Cnty. Health Care for the Homeless & Cmty. Assessment, Planning & Evaluation, *Alameda County Homeless Mortality Report, Calendar Year 2024: Executive Summary* 1 (2025) [hereinafter *Mortality Report*], https://perma.cc/9GJM-ND5B.

[10] *Id.* at 3; Ctrs. for Disease Control & Prevention, *FastStats: Life Expectancy* (last updated Sept. 29, 2026), https://perma.cc/SQ5Y-FKAU.

County's homeless was chronic illness, such as heart disease, cancer, diabetes, liver disease, and HIV.[11] Nearly half of these deaths occurred outside of medical settings, meaning the deceased were not receiving the medical care they needed.[12] Drug overdose, homicide, and accidental death are also leading causes of death among the County's unhoused.[13] Unsheltered people experiencing homelessness are at a particularly high risk of mortality.[14]

A comprehensive solution to homelessness has proven elusive, in part, because its causes vary widely. One major cause is California's housing costs.[15] But mental health, including substance abuse and addiction disorders, also plays a large role.[16] Some people experience

---

[11] *Mortality Report, supra* note 9, at 5.

[12] *Id.*

[13] *Id.*

[14] *See* Jill S. Roncarati et al., *Mortality Among Unsheltered Homeless Adults in Boston, Massachusetts, 2000–2009*, 178 JAMA Internal Med. 1242 (2018).

[15] Kushel & Moore, *supra* note 3, at 32.

[16] *Id.* at 43.

homelessness after fleeing domestic violence and have nowhere else to turn.[17] Still others end up homeless due to discriminatory housing policies.[18] And even when homelessness is solved on an individual level, that success is often fleeting. A person who has experienced homelessness will most likely experience it again.[19]

Solutions to a crisis this complex must be dynamic and multi-faceted. The state of California spent over $20 billion between 2018 and 2023 on a variety of programs to combat homelessness, including providing block grants to local governments, creating more affordable housing through repurposing existing structures, and assisting homeless individuals living in encampments to find housing and critical services.[20] Local

---

[17] *Id.* at 39–41.

[18] *Id.* at 41.

[19] *Id.* at 24.

[20] Legis. Analyst's Off., *The 2023-24 Budget: Updates on Recent Housing and Homelessness Augmentations and Overview of Proposed Budget Changes* 6 (2023), https://perma.cc/N9M5-W5MR; Legis. Analyst's Off., *The 2025–26 California Spending Plan: Housing, Homelessness, and Local Government* (Oct. 22, 2025), https://perma.cc/393M-8LBX; Grant Parks, *Homelessness in California: The State Must Do More to Assess the Cost-Effectiveness of Its Homelessness Programs*, Rep. No. 2023-102.1, at 1–2 (2024), https://perma.cc/62W6-RW6D.

governments often supplement state programs.[21] The significant investment in homelessness at all levels of California government illustrates that federal courts, which lack similar resources and expertise, are poorly equipped to tackle this ongoing and evolving epidemic.

### B. The Bay Area's homelessness problem is massive and persistent.

Homelessness is particularly acute in the Bay Area. According to 2024 data, an estimated 38,891 people were homeless in the Bay Area.[22] Between 2015 and 2024, the Bay Area's homeless population grew 46%.[23] The Bay Area's homelessness crisis affects counties across the region. Between 2023 and 2025, Santa Clara County's homeless population rose 8%, totaling roughly 10,700 people, reaching an all-time high.[24] Individual cities within Santa Clara County were particularly affected. The City of Mountain View, for example, saw its homeless population balloon 56%

---

[21] Parks, *supra* note 20, at 4.

[22] Kasia Pawlowska, *New Data Shows California's Homelessness Problem Is Only Getting Worse*, SFGATE (Jan. 7, 2025), https://perma.cc/WL3H-EP8L.

[23] *Id.*

[24] Santa Clara Cnty., *Point-in-Time Count Community Report 2025* 4 (2025), https://perma.cc/VT9H-UJ7R.

in that same two-year period.[25] Meanwhile, in Contra Costa County, homelessness rose 18.5% between 2023 and 2024.[26] In San Francisco County, the homeless population grew 7% between 2022 and 2024.[27]

Due to the efforts of state and local governments, the Bay Area's homelessness epidemic has started to improve. Between 2024 and 2026, the homeless population in six Bay Area counties declined by almost 3,000 people combined.[28] No single strategy accounts for the progress the region has made.

San José, for instance, has made exceptional progress by focusing on drawing people away from encampments and into safe living space. San José, whose mayor, along with the Bay Area Council, sponsored the recent Interim Housing Act (SB 1395, Becker), added 1,319 short-term

---

[25] *Id.* at 19; Press Release, City of Mountain View, *City Statement: 2025 Santa Clara County Point-in-Time Count* (Sept. 23, 2025), https://perma.cc/6MQ4-KDA2.

[26] *Homelessness in Contra Costa County Has Increased by 18.5% Since 2023*, CBS News Bay Area (June 1, 2024), https://perma.cc/EBQ5-Q4D7.

[27] S.F. Dep't of Homelessness & Supportive Hous., *2024 Point-in-Time Count*, S.F. Gov. (Sept. 6, 2024), https://perma.cc/L7RT-F96U.

[28] Christian Leonard, *Bay Area Homelessness Is Declining—Except in This County*, S.F. Chron. (July 24, 2026), https://perma.cc/UW8Q-WCD7.

beds, while also investing heavily in building "tiny homes" designed to provide individuals with a safer and more comfortable experience than a traditional shelter.[29] The city has combined this new construction effort with a focus on eliminating unsafe encampments.[30] In the eighteen months leading up to September 2026, San José's unsheltered homeless population dropped by 32%.[31]

San Francisco has taken a different approach. For years, San Francisco faced a growing homelessness crisis, despite investing in homelessness services at a scale unmatched in the region. By 2023, the city reported the largest permanent supportive housing portfolio of any Bay

---

[29] Press Release, Off. of Sen. Josh Becker, *Governor Signs the Interim Housing Act, Giving Cities and Counties Proven Tools to Address Homelessness* (Sept. 19, 2024), https://perma.cc/M8QR-28KA; Guy Marzorati, *Tiny Homes, Big Ambitions: Matt Mahan's Run for Governor Spotlights His Shelter Strategy*, KQED (Feb. 17, 2026), https://perma.cc/77Z6-ZD8S.

[30] Guy Marzorati, *San José Council Approves Mahan's Shelter Enforcement Plan*, KQED (June 11, 2025), https://perma.cc/7NUY-XM4T.

[31] Ann Rubin, *San Jose Reports 32% Drop in Homeless Population with New Tracking Model*, KTVU FOX 2 (Sept. 16, 2026), https://perma.cc/SJ3R-3LK9.

Area county and the second largest per capita of any city in the nation.[32] Yet homelessness rose 7% between 2022 and 2024, and 41% of the people counted as homeless in 2024 reported that they were last housed somewhere other than San Francisco.[33] Services concentrated in a single jurisdiction, without more, did not reduce the region's unhoused population.

In 2025, San Francisco changed course and brought "accountability to a system that needed more of it."[34] It enacted a large-vehicle program to restore public spaces, expanded a program that reconnects people with family outside San Francisco, and gave law enforcement a defined role in street response.[35] It also prioritized a response to mental-health-related

---

[32] Press Release, Off. of the Mayor, City & Cnty. of S.F., *San Francisco Receives $18.2 Million Project Homekey Grant to Support Adding New Permanent Supportive Housing* (Nov. 9, 2023), https://perma.cc/YNN9-V6Q2.

[33] S.F. Dep't of Homelessness & Supportive Hous., *supra* note 27.

[34] Press Release, Off. of the Mayor, City & Cnty. of S.F., *Mayor Lurie Announces San Francisco Has Reached Lowest Level Of Unsheltered Homelessness In 15 Years* (May 12, 2026) [hereinafter *Lowest Level Of Unsheltered Homelessness*], https://perma.cc/6CFA-CU4K.

[35] *Id.*

causes of homelessness, including drug addiction.[36] San Francisco's unsheltered homeless population is now at its lowest level in fifteen years.[37]

Both cities' strategies are working. Local governments address homelessness best when they have the flexibility to tailor solutions to the communities they serve, without fear of federal injunctions.

### C. The district court's orders threaten the City's progress towards meaningful homelessness solutions.

Berkeley has also made progress against homelessness. In 2022, Berkeley reported its first decline in the city's homeless population in recent history, dropping almost 5% from 2019.[38] This decline was paired with a 13% increase in volunteers, service providers, and shelters in the city.[39] In 2024, Berkeley saw another, larger drop in its homeless

---

[36] Press Release, Off. of the Mayor, City & Cnty. of S.F., *Mayor Lurie Signs Legislation to Expand Drug-Free Permanent Supportive Housing, Building on Progress of Breaking the Cycle Plan* (July 29, 2026), https://perma.cc/KFY5-6YEQ.

[37] *Lowest Level Of Unsheltered Homelessness*, *supra* note 34.

[38] Supriya Yelimeli, *Berkeley's Homeless Population Dropped 5% During the Pandemic, Report Says*, Berkeleyside (May 16, 2022), https://perma.cc/75JB-HWHB.

[39] *Id.*

population, down an additional 21% since 2022.[40] Unsheltered homelessness also declined 45% during that same period.[41]

This significant progress was not accidental. Berkeley applied intentional, carefully crafted strategies to tackle the problem and make the city safer for both its housed and homeless residents. Berkeley deploys its Homeless Response Team to help move people "from sidewalks to safety through meaningful outreach and service provisions."[42] That team focuses on assisting people to leave encampments "both for the health of the encampment residents and the community at large."[43] Berkeley also provides rental assistance to underserved residents and invests in

---

[40] Memorandum from Dee Williams-Ridley, City Manager, City of Berkeley, to Honorable Mayor & Members of the City Council, *As Shelter and Permanent Housing Investments Have Increased, Berkeley's Homelessness Has Declined* 1 (May 16, 2024), https://perma.cc/263T-LG2W.

[41] *Id.*

[42] Memorandum from Paul Buddenhagen, City Manager, City of Berkeley, to Honorable Mayor & Members of the City Council, *Implementation of Berkeley's New Encampment Policy* 1 (Oct. 7, 2024), https://perma.cc/3LL4-5V5J.

[43] *Id.* at 2.

housing facilities to help homeless residents get off the streets.[44] City residents also voted to increase the real property transfer tax to fund $11 million in homelessness mitigation, with the funds going towards "navigation centers, mental health support, rehousing, and other services for the homeless."[45]

As of 2024, the data were clear—Berkeley's approach to solving homelessness was a winning one. But this progress was fragile. Since the district court first enjoined the City in June 2025, Berkeley has lost ground. In 2026, for the first time since before the COVID-19 pandemic, Berkeley gave up gains as its homeless population rose 4%.[46] The district court's orders have sapped Berkeley of its ability to adequately respond to its once-again-growing homelessness crisis.

---

[44] City of Berkeley, *Coordination and Compassion: Berkeley's Response to Homelessness*, *attached to* Memorandum from Paul Buddenhagen, City Manager, City of Berkeley, to Honorable Mayor & Members of the City Council, *Berkeley's Response to Homelessness: New Materials Tell the Story of the City's Success* 4 (Oct. 2, 2024), https://perma.cc/4TEM-C89H.

[45] City of Berkeley, *Measures P and W: Real Property Transfer Tax to Fund Homeless Services*, https://perma.cc/YZ85-QECG (last visited Oct. 29, 2026).

[46] Alastair Boone, *Alameda County PIT Count Shows Decrease in Homelessness*, KALW (May 20, 2026), https://perma.cc/4MYY-HYUZ.

### D. The district court's orders have resulted in real-world harm at the Harrison Street encampment.

The Harrison Street encampment has been the epicenter of Berkeley's homelessness crisis. Site visits by the City's Environmental Health Division and the Fire Department as far back as August 2023 revealed "escalating" and "significant health and safety hazards," including human and animal feces and urine, blood-filled syringes, rotting food and debris, and combustible materials inside and near structures. 1-ER-98; 6-ER-1226; 1-FER-117–18. Given the seriousness of the conditions at the Harrison Street encampment, the City determined that full abatement was necessary. The City posted notice of the Harrison Street abatement in January 2025. 1-ER-99.

The encampment was only partially cleared because the district court granted temporary injunctive relief from the abatement for seven individuals and appointed a special master to adjudicate claims for accommodations from twenty-one more camp residents. 1-FER-25–26. And in the nearly two years since the notice, conditions have further deteriorated.

In late 2025, several cases of leptospirosis in dogs and rats were linked to the Harrison Street encampment.[47] By mid-2026, the disease, which can be spread to humans through the urine of infected animals,[48] infected two people living in a rat-infested motor home about a mile from the Harrison Street encampment.[49] These were the first two documented human cases of leptospirosis in Berkeley in more than a decade, and while one resident survived the illness, the other did not.[50] Leptospirosis remains a threat to the broader community, as it can diffuse through soil and standing water, contaminating the environment around it.[51]

---

[47] Noemi Doohan & Scott Gilman, City of Berkeley Health, Hous. & Cmty. Servs. Dep't, *City of Berkeley Public Health Alert: Addressing Leptospirosis at Harrison Street Encampment* 3 (Jan. 12, 2026), https://perma.cc/D2GN-ZMJA.

[48] Ctrs. for Disease Control & Prevention, *About Leptospirosis* (Feb. 10, 2026), https://perma.cc/8LPP-UA5L.

[49] Noemi Doohan & Scott Gilman, City of Berkeley Health, Hous. & Cmty. Servs. Dep't, *City of Berkeley Public Health Update: Addressing Leptospirosis at Harrison Street Encampment* 1–2 (June 10, 2026), https://perma.cc/PS6A-TUGS.

[50] *Id.*

[51] *Id.* at 5.

The serious conditions at the encampment have also burdened Berkeley's fire and police departments. In the first eight months of 2026 alone, the Berkeley Fire Department responded to more than a dozen fires at Harrison Street.[52] When firefighters responded to these calls, they often found obstructed hydrants and other conditions that prevented effective containment.[53] Berkeley police have responded to many incidents at Harrison Street, including fights, thefts, gun discharges, drug use, and break-ins. 1-ER-99.

Now, nearly two years after the first abatement notice was issued, the City remains mired in litigation and prevented from taking basic action to respond to these unsanitary and dangerous conditions.

## II. The district court hampered the City's ability to address homelessness through a series of legal errors.

The City's current predicament is the product of a series of legal errors. The district court began by disregarding the central lessons animating the Supreme Court's reasoning in *City of Grants Pass v. Johnson*,

---

[52] Vicente Vera, *'The Usual' Location: Fires Plague Berkeley Homeless Camp*, Berkeley Scanner (Sept. 10, 2026), https://perma.cc/GMG9-R4ZC.

[53] *Id.*

603 U.S. 520 (2024). It then misapplied the ADA and issued citywide injunctive relief without any of the procedural safeguards of Rule 23.

### A. The district court's orders reconstructed the regime that *Grants Pass* dismantled.

The district court's orders run counter to the lesson of *Grants Pass*, which rejected this Court's line of cases that held enforcing generally applicable camping ordinances against people "who are 'involuntarily' homeless" violated the Eighth Amendment's prohibition on cruel and unusual punishment. 603 U.S. at 552. *Grants Pass* did more than correct a misreading of one constitutional amendment. It explained why homelessness policy belongs to the American people and their elected representatives, not federal judges, and that reasoning applies with full force here.

The message of *Grants Pass* transcends the Eighth Amendment. The Supreme Court noted that "[s]ome suggest that homelessness may be the 'defining public health and safety crisis in the western United States' today." *Grants Pass*, 603 U.S. at 528. And it recognized that as encampments like the one at Harrison Street have grown, "so have the challenges they can pose for the homeless and others." *Id.* at 529. Diseases, for example, "can sometimes spread in encampments and beyond

them." *Id.* at 530. And anyone who lives near an encampment might be "forced to navigate around used needles, human waste, and other hazards to make their way to school, the grocery store, or work." *Id.*

Under this Court's prior precedent, people were "involuntarily" homeless "only when the overall homeless population exceed[ed] the total number of 'adequate' and 'practically available' shelter beds." *Grants Pass*, 603 U.S. at 553. But determining the ratio of people experiencing homelessness to available beds is difficult in practice because a city's homeless population can fluctuate dramatically. *Id.* Even determining what was "adequate" and "available" was not straightforward. Is a bed "available" to a smoker if the shelter bans nicotine? *Id.* at 554. Or to an atheist, if the shelter includes "religious" messaging? *Id.* These "abstract rules created by" federal judges "far from the front lines," though well intentioned, did not work in practice. *Id.* at 553.

This regime had serious unintended consequences. The Supreme Court took seriously the reports from cities that *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), had "undermined their efforts to balance conflicting public needs and mired them in litigation at a time when the homelessness crisis calls for action." *Grants Pass*, 603 U.S. at 556. Such

intervention, the Court recounted, "made it more difficult, not less, to help the homeless accept shelter off city streets." *Id.* The Supreme Court ultimately rejected a rule that would "authorize federal judges to freeze into place their own rules on matters long 'thought to be the province' of state and local leaders" and "deny communities the 'wide latitude' and 'flexibility'" they need to "address the homelessness crisis." *Id.* at 559–60.

The lesson of *Grants Pass* is unmistakable: local officials, not federal judges, are best suited to make homelessness policy. Federal judges should not decide whether and when a city may enforce its generally applicable camping rules. And that call for judicial restraint does not turn on the label a claim carries. A federal court is no better equipped to set Berkeley's homelessness policy under the ADA than under the Eighth Amendment.

Here, the district court disregarded that lesson by issuing a series of injunctions, culminating in a citywide permanent injunction, that prevented democratically accountable City officials from carrying out their core duties of promoting public health and safety. The orders below reconstruct the regime that *Grants Pass* dismantled. The district court

allowed five individuals to relocate into areas the City had designated as "no lodging" zones, second-guessing the City's rationale for those designations and paving the way for other unsheltered people with disabilities to seek similar exemptions. The shelter-availability test rejected in *Grants Pass* spawned countless follow-up questions in need of adjudication. Here, a special master decides, member by member, the size and location of tents on City sidewalks. And such regimes, after *Grants Pass* no less than before, divert precious municipal resources from solving the homelessness crisis to litigation. Here, the City has been in continuous litigation over a single encampment for nearly two years.

As the Court in *Grants Pass* noted, "many broadly agree that 'policymakers need access to the full panoply of tools in the policy toolbox' to 'tackle the complicated issues of housing and homelessness.'" 603 U.S. at 533. Affirming the district court's orders would take those tools off the table once again, leaving federal judges to decide whether and when municipalities can use them.

**B. The district court misapplied the ADA.**

The district court's ADA rulings rest on a mistaken premise: that the City's sidewalks exist both for public passage and as "locations of

abode for the unhoused." 1-ER-124. But a Title II program is defined by what an entity provides. And cities, not federal courts, decide the uses to which they will put their own property.

Sidewalks have long been understood to provide passage for pedestrians. The ADA's own sidewalk obligations require public entities to install curb ramps whenever they build or alter streets, 28 C.F.R. § 35.151(i), and to maintain the accessible features of their facilities "in operable working condition," *id.* § 35.133(a). Federal regulations likewise provide that a "path of travel" includes a "continuous, unobstructed way of pedestrian passage" and may consist of "walks and sidewalks." *Id.* § 35.151(b)(4)(ii). And this Court has previously recognized that cities must ensure sidewalks are accessible to pedestrians with mobility and vision disabilities. *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002); *see also Cohen v. City of Culver City*, 754 F.3d 690 (9th Cir. 2014) (reversing summary judgment for city that permitted a sidewalk curb ramp obstruction that forced a pedestrian with a mobility impairment into the street).

The district court's mistaken premise has channeled disability accommodations for the unhoused exclusively onto public sidewalks. In

denying injunctive relief to five unhoused individuals seeking to relocate to vacant City-owned lots, the district court explained that it had "defined the 'program' for purposes of the ADA as the sidewalks and public ways of the City, not public lots." 1-FER-29. And it explained that other "viable sidewalk locations" existed for encampments. *Id.* In fact, the court explained that it would not consider relocation to a lot unless BHU carried the "heavy burden" of showing that the City's restrictions on rights of way were "so onerous as to foreclose *any* relocation to sidewalk locations in Berkeley." *Id.* And it granted relief to five other individuals who proposed to move onto sidewalks the City had designated "no lodging." *Id.* at 28–29. Under the district court's reasoning, the one public space that federal law dedicates to accessible passage for the disabled is presumptively the only place to locate unhoused people with disabilities.

Requiring municipalities to evaluate which of their sidewalks are suitable "locations of abode" for unhoused people with disabilities, 1-ER-124, comes at a heavy price. Recent studies show that almost half of all people experiencing homelessness live with a disability, a rate about 2.5

times greater than the general population.[54] Given the large number of unhoused people with disabilities, affirming the district court's interpretation of the ADA would flood municipalities with accommodation requests, as has already happened in Berkeley. Accommodations on that scale would convert sidewalks from rights of way into places of abode—the very definition of a fundamental alteration. And requiring cities to decide, person by person, whether disabled homeless people may stay on the sidewalk resurrects the pre–*Grants Pass* bar on enforcing camping ordinances, one accommodation at a time.

That result defeats the ADA's purpose of making public spaces accessible to the disabled. Rather than prioritizing the clear paths of travel that have long been understood to be a central fixture of the ADA, the district court's orders treat passage as an interest that must yield to a purpose for which the sidewalks were never intended, creating a

---

[54] Whitney Thurman et al., *"The System Tends to Scoop You Up and Spit You Out and They're Done With You": The Intersection of Intellectual/Developmental Disability and Homelessness From the Perspectives of Service Providers*, 33 Qualitative Health Rsch. 1017, 1017 (2023); *see also* Cal. Health Care Found., *People Experiencing Homelessness in California*, Cal. Health Care Almanac (Oct. 2024), https://perma.cc/TRT5-EELM (reporting that, in 2023, 48% of people accessing California's homelessness response system reported a disability).

"modification" for some people with disabilities that degrades access for others. Affirming that reading would prevent local governments from maintaining sidewalks as public rights of way and expose them to ADA litigation from wheelchair users, blind pedestrians, and others with disabilities who have long depended on clear public passageways. Instead, this Court should hold that even if the relevant program is the City's maintenance of its sidewalks, that program exists for safe, accessible passage, and modifications that convert sidewalks into living space fundamentally alter it as a matter of law.

### C. The district court granted class-wide relief without the procedural safeguards of Rule 23.

The district court's permanent injunction extends to "all BHU members, wherever situated within the City, and is not limited to the Harrison Encampment or to any previously identified claimants." 1-FER-87. Membership in BHU, meanwhile, is self-declared, and BHU has never disclosed its membership. An injunction whose beneficiaries are defined only by their own say-so is precisely the kind of injunction that "prohibit[s] enforcement of a law or policy against *anyone*" as opposed to just the plaintiffs in the lawsuit. *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). And by "forging a shortcut to relief that benefits parties and

nonparties alike," the district court's order "circumvent[s] Rule 23's procedural protections and allow[s] courts to create de facto class actions at will." *Id.* at 849 (cleaned up). Such an open-ended injunction—just like the universal injunction in *CASA*—"likely exceed[s] the equitable authority that Congress has granted to federal courts." *Id.* at 837.

Permitting this case to proceed as a class action without the strictures of Rule 23 threatens harm to all municipalities. Among other things, Rule 23 requires a court to carefully define a class and binds class members to the judgment in that case. In cases like this one, however, the class is not defined. Membership in the association is fluid and self-declared, and non-members are not bound by an adverse judgment. In effect, the district court's approach gives Plaintiffs in this case all the benefits of Rule 23 with relief available to anyone who declares membership, but leaves all municipalities vulnerable to liability from anyone who wishes to bring further litigation, leaving cities "mired . . . in litigation at a time when the homelessness crisis calls for action." *Grants Pass*, 603 U.S. at 556.

## CONCLUSION

*Grants Pass* explained that the federal judiciary is ill equipped to "'match' the collective wisdom the American people possess in deciding 'how best to handle' a pressing social question like homelessness." 603 U.S. at 560. But the orders below attempt just that—substituting the district court's judgments on homelessness policy for those of Berkeley's democratically accountable leaders. The Council respectfully urges the Court to return the management of homelessness policy to the City of Berkeley.

Dated: October 29, 2026

Respectfully submitted,

s/ Bradley J. Hamburger
Bradley J. Hamburger

*Counsel for Amicus Curiae*
*Bay Area Council*

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 32-1(a) because it contains 5,464 words, excluding the portions exempted by Federal Rule 32(f). The brief also complies with Federal Rule of Appellate Procedure 32(a)(5)(A) and (6) because it has been prepared using Microsoft Word in 14-point, New Century Schoolbook font.

Dated: October 29, 2026

Respectfully submitted,

s/ Bradley J. Hamburger
Bradley J. Hamburger

*Counsel for Amicus Curiae*
*Bay Area Council*

## CERTIFICATE OF SERVICE

I certify that on October 29, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system. All parties in the case who are registered ACMS users will be served by the appellate ACMS system.

I certify that I served the foregoing documents on this date by hand delivery, mail, third-party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case party participants:

Frank Moore (pro se)
1349 Hearst Ave.
Berkeley, CA 94702

Dated: October 29, 2026

Respectfully submitted,

s/ Bradley J. Hamburger
Bradley J. Hamburger

*Counsel for Amicus Curiae*
*Bay Area Council*